UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAVLE ZIKOVIC, on behalf of himself and others similarly situated,<br><br>    Plaintiff,<br><br>    -v-<br><br>LAURA CHRISTY LLC d/b/a VALBELLA, LAURA CHRISTY MIDTOWN LLC, DAVID GHATANFARD, AND GENCO LUCA,<br><br>    Defendant. | Case No.: 17-CV-00553-GHW |

**NON-PARTY ROSEY KALAYJIAN'S MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR AN ORDER OF ATTACHMENT**

**BAKER & HOSTETLER LLP**
Michael S. Gordon
Maximilian S. Shifrin

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4265
Facsimile: (212) 589-4280
mgordon@bakerlaw.com
mshifrin@bakerlaw.com

*Attorneys for Non-Party
Rosey Kalayjian*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ..................................................................................................1

COUNTERSTATEMENT OF BACKGROUND..........................................................................4

    A.    Rosey's Personal Life with David .................................................................................4

        1.    The Joint Purchase of the Canterbury House and Opening of the Joint Account..................................................................................................................4

        2.    The Sale of the Canterbury House and Deposit of the Proceeds into the Joint Account ...........................................................................................5

        3.    The Joint Payment for the Southampton House and Rosey's Extensive Renovations............................................................................................5

        4.    The Refinancing and Title Transfer of the Southampton House ................6

        5.    Rosey's Withdrawal of the Canterbury Sale and Southampton Refinancing Proceeds In Consideration for Invaluable Contributions to Both Properties ............................................................................................7

    B.    Rosey's Extensive Business Partnership with David................................................8

        1.    Rosey Managed Valbella Meatpacking .......................................................9

        2.    Rosey Reinvented and Managed TuttaBella and Was Thus Entitled to the Full Proceeds of its Subsequent Sale (Prior to the Commencement of this Action) in Consideration For Her Efforts ......................................9

        3.    Rosey Was the De Facto and Underpaid Chief Operating Officer of One If By Land and Was Entitled to the Full Proceeds from its Sale .......10

        4.    Rosey Opened and Managed Bellasera Without Receiving Any Compensation .........................................................................................11

        5.    Rosey Opened and Helped Manage Valbella Midtown and the Income Therefrom Was Deposited into the Joint Account....................................11

        6.    Rosey Created Oak Grove Road, LLC and Opened Valbella At The Park with New Partner Robert Daleo/Alpine Pike Investments, LLC.......12

LEGAL STANDARDS ...............................................................................................................14

ARGUMENT ..............................................................................................................................16

I.      PLAINTIFFS HAVE NOT DEMONSTRATED A PROBABILITY OF SUCCESS
        ON THE MERITS OF THEIR ANTICIPATED TURNOVER APPLICATION AND
        THUS ARE NOT ENTITLED TO AN ORDER OF ATTACHMENT ...........................16

        A.      Half the Funds Deposited Into the Joint Account ($2,030,277.75) Belonged to
                Rosey, and Thus Her Withdrawal of Those Funds Were Not "Transfers"
                Under the UVTA...................................................................................16

        B.      Because Rosey Provided Consideration of More Than Reasonably Equivalent
                Value for the Remaining $1,905,277.93, the Title to the Southampton House,
                and Her Interest in OGR, Those Transfers Were Not Made With Intent to
                Hinder, Delay, or Defraud .....................................................................19

        C.      David's Age and Health Issues Provide Additional Context for the Transfers .....23

II.     NO GROUNDS FOR ATTACHMENT EXIST................................................23

III.    THE COURT SHOULD ORDER PLAINTIFFS TO PROVIDE A SUBSTANTIAL
        UNDERTAKING ................................................................................24

IV.     PLAINTIFFS HAVE NOT DEMONSTRATED ANY NEED FOR DISCOVERY IN
        AID OF AN ATTACHMENT ..................................................................25

CONCLUSION..............................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actrade Fin. Techs. Ltd.*,
  337 B.R. 791 (Bankr. S.D.N.Y. 2005) ..................................................................19

*Asdourian v. Konstantin*,
  50 F. Supp. 2d 152 (E.D.N.Y. 1999) ....................................................................15

*Bollenbach v. Haynes*,
  2018 WL 4278347 (S.D.N.Y. May 29, 2018) .......................................................15

*Brastex Corp. v. Allen Int'l, Inc.*,
  702 F.2d 326 (2d Cir. 1983)..................................................................................15

*BSH Hausgeräte, GmbH v. Kamhi*,
  282 F. Supp. 3d 668 (S.D.N.Y. 2017)...................................................................24

*Cadle Co. v. White*,
  2006 U.S. Dist. LEXIS 11671 (D. Conn. Mar. 21, 2006).....................................21

*Chartwell Therapeutics Licensing LLC v. Citron Pharma LLC*,
  2018 WL 1402239 (E.D.N.Y. Mar. 4, 2018).........................................................24

*EMA Fin., LLC v. Joey New York Inc.*,
  2022 WL 292920 (S.D.N.Y. Feb. 1, 2022)............................................................19

*Encore Credit Corp. v. Lamattina*,
  2006 WL 148909 (E.D.N.Y. Jan. 18, 2006) ....................................................23, 24

*Etalon Imob S.R.L. v. Schoenbach*,
  2012 WL 4741595 (S.D.N.Y. Oct. 3, 2012)..........................................................25

*Exeter Holdings, Ltd. v. Haltman*,
  2020 WL 4587533 (E.D.N.Y. Apr. 21, 2020) .......................................................19

*Grafstein v. Schwartz*,
  100 A.D.3d 699 (2d Dept. 2012) ..........................................................................15

*Graubard Mollen Dannett & Horowitz v. Kostantinides*,
  709 F. Supp. 428 (S.D.N.Y. 1989)........................................................................14

*Hill v. Ameritax, Inc.*,
  2012 N.Y. Misc. LEXIS 5061, 2012 NY Slip Op 32684(U), (Sup. Ct. Oct. 17,
  2012) ....................................................................................................................24

*Ivy League Med. Realty Corp. v. Toran*,
    2010 N.Y. Misc. LEXIS 6582 (N.Y. Sup. Ct. Dec. 1, 2010)...................................17

*In re Jacobs*,
    394 B.R. 646 (Bankr. E.D.N.Y. 2008)...................................................................18

*Lamprecht v. Comte*,
    1994 WL 323580 (S.D.N.Y. July 6, 1994) ............................................................24

*In re Leff*,
    631 B.R. 106 (Bankr. E.D.N.Y. 2021).....................................................................17

*Man Wei Shiu v. New Peking Taste Inc.*,
    2013 WL 2351370 (E.D.N.Y. May 28, 2013) .........................................................24

*Neuman v. Garcia*,
    2022 WL 4448722 (S.D.N.Y. Sept. 23, 2023)........................................................15

*Pantheon Props. v. Houston*,
    2022 U.S. Dist. LEXIS 45061 (S.D.N.Y. Mar. 14, 2022) .......................................22

*In re Pisculli*,
    426 B.R. 52 (E.D.N.Y. 2010) .................................................................................21

*Prabir v. Bukhara Indian Cuisine, Inc.*,
    2018 U.S. Dist. LEXIS 94563 (S.D.N.Y. May 17, 2018) .......................................22

*Sylmark Holdings Ltd. v. Silicone Zone Intl. Ltd.*,
    5 Misc. 3d 285 (Sup. Ct. N.Y. Cty. 2004) .............................................................24

*U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*,
    2011 N.Y. Misc. LEXIS 136 (N.Y. Sup. Ct. Jan 31, 2011)....................................23

*Yong Xiong He v. China New Star Rest., Inc.*,
    2020 WL 6202423 (E.D.N.Y. Oct. 22, 2020).................................................21, 25

*Zivkovic v. Valbella at the Park, LLC*,
    Case No. 22-cv-07344-GHW...................................................................................8

**Statutes**

New York's Uniform Voidable Transactions Act ................................................ *passim*

NYDCL § 270(p) ......................................................................................................16

NYDCL § 273................................................................................................15, 16, 21, 22

**Rules**

Fed. R. Civ. P. 9(b) ...............................................................................................3, 15, 16

Fed. R. Civ. P. 69 ...............................................................................................................1

N.Y. C.P.L.R. § 6210 .........................................................................................................1

N.Y. C.P.L.R. § 6220 .......................................................................................................25

N.Y. CPLR 6201 .........................................................................................................14, 23

N.Y. CPLR § 5222 ............................................................................................................22

N.Y. CPLR § 6212 .................................................................................................14, 15, 16

Non-party Rosey Kalayjian respectfully submits this memorandum of law in opposition to Plaintiffs' motion for an order of attachment pursuant to Fed. R. Civ. P. 69 and N.Y. C.P.L.R. ("CPLR") §§ 6210 (Dkt. Nos. 419, 420, 438).

## PRELIMINARY STATEMENT

In early July, Plaintiffs obtained a temporary restraining order ("TRO") enjoining non-party Rosey Kalayjian ("Rosey") from transferring any assets held in her name or for her benefit, and contemporaneously moved to attach certain assets held by Rosey.  Plaintiffs' TRO and their motion for an order of attachment, brought under the Uniform Voidable Transactions Act, N.Y. Debt. & Cred. Law § 273 ("UVTA"), allege that Rosey's life partner, judgment-debtor David Ghatanfard ("David"), fraudulently transferred funds and other interests to Rosey to evade collection of the judgment entered in this case (Dkt. No. 424), which is on appeal.[1]  In making their case, Plaintiffs narrowly focus on a handful of transactions covering a 21-month period, *i.e.*, September 2020 through June 2022, and disregard the rich depth and history of the couple's personal and professional 20-year relationship, which belies Plaintiffs' seemingly paternalistic contention that every asset linked to Rosey belongs to, or is being held for, David.

Indeed, Rosey and David are longstanding life partners and business partners.  As life partners, they have shared three homes and deliberately comingled their assets in a joint account they maintained at Patriot Bank (the "Joint Account").  As business partners, Rosey has played a critical managerial role in every restaurant in David's portfolio, leaving a previous budding career in finance to fully devote herself to the development of those restaurants.  As is often the case in long-term relationships, the couple's manifest intention to join their lives and their assets did not always coincide with the formal protections afforded by marriage or written contracts.  The couple never

---

[1] Defendants-appellants Laura Christy LLC d/b/a Valbella, Laura Christy Midtown LLC, and David Ghatanfard filed their opening appellate brief on August 23, 2023.

married and, for years, have lived as *de facto* joint-owners of two properties for which, on paper, David was the *de jure* sole owner.  But although an arrangement of this sort may seem imprudent retrospectively, the critical context it provides deserves its full weight as evidence.  For it is this context that explains the small subset of transactions culled from the couple's long history, not the pendency of a lawsuit with an uncertain outcome.  And it is in this context that Plaintiffs bring their motion to attach and ultimately obtain the turnover of Rosey's life savings, her 50% stake in a new restaurant that she launched with another business partner, and her home without any consideration of the rights and entitlements that she has earned over two decades.

In Plaintiffs' zeal to enforce their judgment – a zeal undoubtedly fueled by the fact that more than 40% of the judgment goes to Plaintiffs' counsel (*see* Dkt. No. 424 at 2-3) – Plaintiffs advance the revisionist narrative that Rosey provided no consideration for, and has no ownership interest in, the assets at issue.  The reality is different.  In Plaintiffs' own telling, every dollar they seek to attach was deposited into the Joint Account used by the couple for more than a decade to comingle their assets and pay joint expenses.  As a threshold matter, under New York law, half of that money is Rosey's – and thus the withdrawal of her half was not a "transfer" under the UVTA, which only applies to assets of the *debtor* (*i.e.*, David).  This application of straightforward joint-tenancy principles alone reduces Plaintiffs' claim from roughly $3.9 million to $1.95 million.

Yet Plaintiffs have no claim to the other $1.95 million either.  Any transfers from the Joint Account that exceeded Rosey's 50% entitlement are nevertheless Rosey's because she provided reasonably equivalent value for them in the form of 20 years of undercompensated, and often uncompensated, work managing, investing in, developing, and improving the various restaurants and properties in which David holds an interest.  Indeed, the types of transfers Plaintiffs seek to recover as fraudulent – *i.e.*, deposits into the Joint Account and subsequent withdrawals by Rosey in full –

have precedent in their relationship *prior to the underlying lawsuit*.  For example, in 2016, David transferred to Rosey – via the Joint Account – the proceeds from a sale of one his restaurants, TuttaBella, as repayment for her significant efforts in transforming that restaurant from a struggling business to a very profitable one.  The cash transfers in this case followed this very pattern, and Rosey provided ample consideration for all alleged transfers – liquid and illiquid alike.

To recover under the UVTA, Plaintiffs must demonstrate that David made "transfers" to Rosey, as defined by the UVTA, with the "*actual* intent to hinder, delay or defraud."  The full evidentiary context surrounding Rosey's longstanding partnership with David – which Plaintiffs acknowledge only superficially – forecloses that conclusion, especially under the heightened attachment standards requiring Plaintiffs to show a *probability* of success on their UVTA claim. Indeed, the evidence annexed to Rosey's accompanying declaration demonstrates that (i) the deposits into, and subsequent withdrawals from, the Joint Account, and (ii) David's conveyance to Rosey of a joint-tenancy interest in a home and a majority interest in a limited liability company were either not "transfers" at all under the UVTA and/or were made in the context of a longstanding life and business partnership for "reasonably equivalent value."  As such, Plaintiffs have not, and cannot, demonstrate any intent to defraud, much less with the requisite specificity under Fed. R. Civ. P. 9(b).

Accordingly, based on the foregoing, and as set forth more fully below, Rosey respectfully requests that the Court deny Plaintiffs' attachment motion in full, including Plaintiffs' request for discovery.  And in the event the Court grants Plaintiffs' motion, in whole or in part, Rosey respectfully requests that the Court require Plaintiffs to post an undertaking in the amount of at least $400,000.

## COUNTERSTATEMENT OF BACKGROUND

Plaintiffs' "Background" section itemizes each transaction they identify purely through the limited prism of money in – money out and devoid of the actual context in which these transactions occurred.  What follows is a full explanation and documentation of Rosey's personal and professional relationship with David, as attested in her accompanying declaration,[2] which is essential for the resolution of Plaintiffs' motion.

### A.     Rosey's Personal Life with David

Rosey and David are life partners who have lived together for approximately 20 years. Rosey Dec. ¶ 4.  Rosey met David in or about 2004 when she took a job as a hostess at David's restaurant in Greenwich, Connecticut, Valbella Greenwich.  At the time, Rosey worked at a hedge fund in Rye, New York.  Over time, a personal relationship developed between Rosey and David.

#### 1.     The Joint Purchase of the Canterbury House and Opening of the Joint Account

When Rosey became pregnant in 2007, they bought a house on Canterbury Road in Harrison, New York (the "Canterbury House") to support what they hoped would be their growing family.  *Id.* The sale closed on April 2, 2008.  Because Rosey worked part-time as a real estate broker, she selected the home from those on the market, brokered the sales transaction, earned a commission, and contributed that commission toward the Canterbury House.  *Id.* at ¶ 5.  Although she was not added to the deed on the Canterbury House, Rosey and David had an express understanding that she was a joint owner of that property.  *Id.* at ¶ 6.  When asked during his deposition whether he was the sole owner of the Canterbury House, David replied, "on paper, yes," and further explained that he and Rosey had a "handshake agreement" that it was a joint house in which they both invested.

---

[2] Citations to "Rosey Dec." refer to the Declaration of Non-Party Rosey Kalayjian in Opposition to Plaintiffs' Motion for Attachment dated August 25, 2023 accompanying this memorandum of law.  Citations to "Shifrin Dec." refer to the Declaration of Maximillian S. Shifrin in Opposition to Plaintiffs' Motion for Attachment dated August 25, 2023, also accompanying this memorandum.

Shifrin Dec. Ex. 1, 38:15-17; 131:8-9.  Rosey lived in the Canterbury House and conducted herself as

any co-owner would, and she managed various home improvements – including to the driveway,

landscaping, fence, and pool.  Consistent with their treatment of the Canterbury House as a joint

asset, Rosey and David opened a joint account at Patriot Bank (the "Joint Account") in 2011 to pool

their assets and provide a shared security.  Over the course of the next decade, both David and Rosey

would make deposits into the Joint Account and use it to pay numerous joint expenses, including,

among others, the mortgage on the Canterbury House.  Rosey Dec. ¶ 8.

       2.     *The Sale of the Canterbury House and Deposit of the Proceeds into the Joint
Account*

Rosey lost the pregnancy that prompted the couple's purchase of the Canterbury House and

would subsequently lose six more over her time at the Canterbury House.  With no children to fill the

house, and Rosey haunted by her miscarriages, the couple repeatedly placed the property on the

market over the next decade without success – including in 2011, 2012, 2014, 2016, twice in 2017,

and finally in 2020.  Rosey Dec. Ex. 4.  It was not until the COVID-19 pandemic dramatically

increased demand for suburban homes that the couple was able to sell the Canterbury House in

September 2020.  When asked during his deposition why he sold it, David replied "Because the

house was too big for us."  Shifrin Dec. Ex. 1, 38:21-22.  Consistent with the lives they had built

together, including their 12 years living together in the Canterbury House and their Joint Account,

David deposited the $1,237,762.50 in sales proceeds (the "Canterbury Sale Proceeds") into the Joint

Account, reflecting his longstanding treatment of the house as a joint asset and his intention to treat

the sale proceeds as a joint tenancy.  Rosey Dec. ¶ 10.

       3.     *The Joint Payment for the Southampton House and Rosey's Extensive
Renovations*

When Rosey and David's relationship began, David owned a property on Oak Grove Road in

Southampton, New York, which he purchased a year before he met Rosey (the "Southampton

House").  Just as they did with the Canterbury House, the couple treated the Southampton House as a joint asset despite David being the sole legal owner – including by making their mortgage payment from the Joint Account.  *Id.* at ¶ 11.  Moreover, David rarely used the Southampton House before he met Rosey, and the property was largely unkept and in disrepair.  As their relationship developed, the couple spent more and more time at the Southampton House, with the property eventually becoming their preferred residence.

Given Rosey's keen eye for detail and design, David encouraged her to improve the property.  For well over a decade, Rosey made extensive enhancements and upgrades to the home, including renovating the kitchen, bathrooms, backyard, deck, and landscaping.  Rosey meticulously managed each one of these projects, working directly with the contractors, and picked out all the design elements down to the tile.  Rosey Dec. Exhs. 5-9.  Had this work been outsourced, the designer's fee/commission alone would have been at least $150,000.  When the house sustained approximately $1 million of extensive water damage in 2018 due to water pipes bursting, Rosey oversaw the reconstruction of the house as well as negotiations with the insurance company to process all reimbursements.  Rosey Dec. ¶ 14.  David testified that Rosey "spent so much time and too much effort in that house," explaining that, before Rosey, "it was two car garage they put together," and that Rosey "did other renovations on her money," expressly calling it a "joint house." Shifrin Dec. Ex. 1; 135:4-10.

> 4.    *The Refinancing and Title Transfer of the Southampton House*

In January 2022, David and Rosey refinanced the mortgage on the Southampton House.  The refinancing was triggered by their adjustable-rate mortgage on the property, which was poised to substantially increase toward the end of 2021, as mortgage rates were rising.  Rosey Dec. ¶ 15 (showing fluctuating 4.5% rate in 2020 and fixed 3.5% rate in 2022).  Consistent with Rosey's years-long contributions to the Southampton House, their joint payment of the mortgage to date, their many

years living together with comingled assets, and the couple's treatment of the sales proceeds from the

Canterbury House as joint funds, on January 10, 2022, David deposited the $1,422,793.18 proceeds

from his refinanced mortgage (the "Southampton Refinancing Proceeds") into the Joint Account and

converted his sole title on the Southampton House to a joint-tenancy with Rosey in May 2022.

David also testified that he decided to put Rosey's name on the house because he "was getting

older."  Shifrin Dec. Ex. 1; 135:18-22.  Indeed, David, currently 73 years-old, is more than 20 years

Rosey's senior.  Rosey Dec. ¶ 17.

When pressed on these points during his deposition, David testified that, despite not

originally putting Rosey on the deed, they had "an understanding between each other," just as they

did with respect to the Canterbury House.  He further explained that Rosey "spent a lot of money on

the house," "paid a lot of the mortgages," and "paid a lot of stuff in that house," and because he was

"getting a little older," he "put her on the deed of the house so that she has security."  Shifrin Dec.

Ex. 1, 137:24-25; 138:1-5.  David also testified that, as a practical matter, "nothing changed" when

he put Rosey's name on the deed; the only difference was "if something happen[ed] to [him], she can

have something."  Shifrin Dec. Ex. 1, 138:22-25; 139:1-2.  Seemingly prescient, David recently was

diagnosed with stage four cancer.  Rosey Dec. ¶ 17.  Summarizing the couple's longstanding

comingling of assets and Rosey's contributions, David reiterated that she spent "a lot of money . . .

[and] time . . . rebuilding the house, fixing the house . . . [and] [s]he deserved to be on the deed of the

house."  Shifrin Dec. Ex. 1, 137:24-25; 138:2-5.

   5.   *Rosey's Withdrawal of the Canterbury Sale and Southampton Refinancing*
        *Proceeds In Consideration for Invaluable Contributions to Both Properties*

The deposits of the Canterbury Sale Proceeds and Southampton Refinancing Proceeds into

the Joint Account were consistent with the couple's treatment of their properties as joint assets.

However, given Rosey's substantial contributions to both the Canterbury House and the

Southampton House described above, David wanted Rosey to keep the full Canterbury Sale Proceeds and Southampton Refinancing Proceeds. As such, Rosey withdrew from the Joint Account: (i) the Canterbury Sale Proceeds via transfers to her personal Patriot Bank account (the "Kalayjian Patriot Account") between September 11 and September 16, 2020; and (ii) the Southampton Refinancing Proceeds on January 12, 2022, via cashier's check.

During her February 8, 2023 deposition in the related action before this Court, *Zivkovic v. Valbella at the Park, LLC*, Case No. 22-cv-07344-GHW, Rosey confirmed that these transfers from her Joint Account were "reimbursements." Buzzard Dec., Ex. 1 at 150-52. Contrary to Plaintiffs' baseless allegations that Rosey's testimony was "evasive," Plaintiffs' counsel ambushed Rosey with a bank statement showing a $1,422,793.18 deposit into the Joint Account. Without any prior questioning regarding the refinancing on the Southampton House and given the couple's decade-long use and comingling of assets in the Joint Account, Rosey could not recall at that moment the specific circumstances surrounding that deposit. Buzzard Dec., Ex. 1 at 165:19-170:25. After being badgered by Plaintiffs' counsel, Rosey responded, "It could have been David. It could have been me. I honestly don't remember. I do a lot of banking . . ." *Id.* at 167:11-16.[3]

## B.    Rosey's Extensive Business Partnership with David

As their relationship deepened, Rosey quickly developed into David's lieutenant and served in critical management and supervisory roles across David's portfolio of restaurants for minimal, and often non-existent, compensation.

---

[3] Having had an opportunity to consider this transaction in context, Rosey does not dispute that the January 2022 deposit and subsequent withdrawal at issue involved the Southampton Refinancing Proceeds. However, as explained above and below, Rosey owned at least 50% of these proceeds as a matter of banking law and was entitled to all of them based on the reasonably equivalent value she had provided in the restoration and gut renovation of the property over the years. Rosey Dec. ¶¶ 12, 13, 14.

1.    *Rosey Managed Valbella Meatpacking*

When David opened his first New York restaurant, Valbella Meatpacking, in 2005, he invited Rosey to shift her time from Valbella Greenwich to Valbella Meatpacking.  Forsaking her career at a hedge fund to pour herself into her budding business and personal relationship with David, the scope of Rosey's involvement in David's restaurants significantly expanded once she moved to Valbella Meatpacking.  Nominally a hostess, Rosey was, in reality, a core member of the restaurant's management team.  In that role, Rosey spearheaded marketing efforts, booked and organized private parties, networked on behalf of the business, oversaw regular maintenance and upgrades (*e.g.*, picking new furniture and light fixtures), bought supplies, worked closely with the pastry chef, and many other managerial tasks that far exceeded the duties of a hostess.  Because David did not use email (and still does not), Rosey was, in essence, a proxy for David in various capacities and effectively managed and oversaw his interactions with everyone in the business.  Rosey Dec. ¶ 20.

2.    *Rosey Reinvented and Managed TuttaBella and Was Thus Entitled to the Full Proceeds of its Subsequent Sale (Prior to the Commencement of this Action) in Consideration For Her Efforts*

Not only did Rosey operate as a *de facto* manager of David's restaurants, she often made core marketing and branding decisions that made the restuarants more successful.  For example, early in their relationship, David owned a restaurant in Eastchester, New York called Valbella Steakhouse that was losing money.  In 2008, David asked Rosey to figure out what could be done to change the restaurant's prospects.  Rosey proceeded to reinvent the restaurant, changing its name (from Valbella Steakhouse to TuttaBella), logo, branding, and menu.  The restaurant made substantial profits for several years thereafter, with David playing a silent role in its growth trajectory.  *Id.* at ¶ 21.

Critically, when David sold his share in TuttaBella for approximately $788,000 in January 2016 – prior to the commencement of this action – David gave the full proceeds of the sale to Rosey in consideration for Rosey's extensive contributions to the success of TuttaBella.  Mirroring the

9

transfers Plaintiffs seek to recover here, David deposited the proceeds from the sale into the Joint

Account – entitling Rosey to 50% as a matter of law – which Rosey subsequently transferred in full

to the Kalayjian Patriot Account.  This transfer was consistent with the couple's shared

acknowledgment of Rosey's entitlement to these proceeds based on her invaluable contribution to the

growth and success of TuttaBella.  *Id.* at ¶ 22.

### 3. Rosey Was the De Facto and Underpaid Chief Operating Officer of One If By Land and Was Entitled to the Full Proceeds from its Sale

In February 2015, David became an owner of a pre-existing restaurant called One If By Land

("OIBL") and, just like TuttaBella before it, asked Rosey to focus her efforts on improving that

restaurant's profile and sales.  In the first full year of her involvement, Rosey – without taking any

salary at all – was essentially the Chief Operating Officer, managing everything from accounting,

building permits, and legal compliance.  In 2016, Rosey eventually put herself on the payroll for only

$600 per week, a salary that was not commensurate with her contribution to the restaurant, with the

understanding that she would eventually be repaid. *Id.* at ¶ 23.

During her more than six years overseeing OIBL, Rosey: (i) managed the website design and

other marketing projects for OIBL; (ii) ordered various supplies the restaurant needed; (iii) oversaw

payroll and corresponded with ADP; (iv) managed maintenance projects, including, among other

management-level tasks, organizing security camera installation, new doors, and scheduling garbage

pickup; (v) worked on the renewal of the restaurant's retail and liquor license with the state of New

York; (vi) was in frequent communication with OIBL's landlords; (vii) oversaw insurance-related

issues; (viii) scheduled walkthroughs with building and zoning consultants to prepare for Department

of Buildings inspections; and (ix) managed many administrative tasks, including routinely

communicating with various employees on the full suite of subjects relevant to restaurant

management.  *Id.* at ¶ 24.  Rosey also tirelessly worked on the company's Paycheck Protection

Program applications, which resulted in OIBL receiving funds allowing it to withstand the impact of the COVID-19 pandemic on the business.  David confirmed during his deposition that he neither worked for nor performed *any* services for OIBL during this time.  Shifrin Dec. Ex. 1, 229:11-13.

In 2021, David sold his stake in OIBL for $600,000 ("OIBL Sale Proceeds").  On November 17, 2021, David deposited the OIBL Sale Proceeds into the Joint Account, entitling her to 50% of that deposit.  Consistent with couple's previous treatment of the sale of TuttaBella, the couple agreed to Rosey's entitlement to the full $600,000, with David conveying his $300,000 share in consideration for Rosey's significant contributions to OIBL.  Rosey Dec. at ¶ 26.  Even factoring in the OIBL Sale Proceeds, Rosey still only made an additional $50,000/year in income, on top of her small salary she took, despite her considerable role as *de facto* Chief Operating Officer of OIBL.

4.   *Rosey Opened and Managed Bellasera Without Receiving Any Compensation*

In 2019, Rosey again took the laboring oar opening a new restaurant on behalf of David called Bellasera in Larchmont, NY.  *Id.* at ¶ 28.  Rosey did everything: she named the restaurant, designed the logo, and spearheaded the entire project of opening the restaurant's doors.  After it opened in 2019, and the Covid-19 pandemic began shortly thereafter, Rosey ran the business from home with the General Manager, went to the restaurant every week, and maintained the restaurant's books and records.  By the time David decided to eliminate his stake in the restaurant in 2020, Rosey had devoted approximately a year to that restaurant without getting paid a dime.

5.   *Rosey Opened and Helped Manage Valbella Midtown and the Income Therefrom Was Deposited into the Joint Account*

In 2011, when David sought to open a second restaurant in New York City, Rosey personally shopped around on foot to identify a new location, played a key role in opening what would become Valbella Midtown, and was a critical member of the design team.  Although Rosey ultimately did not spend significant time operating the restaurant, she was pivotal in the marketing, renovation,

employee management, and other tasks commensurate with a manager while simultaneously overseeing TuttaBella, Valbella Meatpacking, OIBL, and Bellasera.  Rosey Dec. ¶ 29.

In addition to the proceeds of the sale of TuttaBella and OIBL, David deposited income he received from his other restaurants into the Joint Account.  As Plaintiffs allege in their moving brief, from September 2020 through September 2021 – an entire year – David made five deposits into the Joint Account of his distributions from Valbella Midtown totaling $800,000 (the "Valbella Midtown Income").  Over the course of that year, Rosey subsequently transferred $675,000 to the Kalayjian Patriot Account, *see id.* – which included her $400,000 half of the $800,000 deposited into the Joint Account and $275,000 of David's share of those same deposits.  *Id.* at ¶ 31.  Given Rosey's uncompensated efforts to open Bellasera and other undercompensated contributions to Valbella Meatpacking and Valbella Midtown over many years, David and Rosey agreed to Rosey's entitlement to David's $275,000 share in consideration of these past contributions – which, at the time, spanned 15 years.  These transfers were fully consistent with how the couple had done business long before the underlying lawsuit was brought, including their "handshake agreements" regarding the Canterbury House, Southampton House, and the sale of TuttaBella.

> 6. *Rosey Creates Oak Grove Road, LLC and Opens Valbella At The Park with New Partner Robert Daleo/Alpine Pike Investments, LLC*

Given Rosey's experience managing TuttaBella, OIBL, Bellasera, and other restaurants, in 2018, Rosey and her longtime friend and mentor, Robert Daleo – a retired former Vice Chairman and Chief Financial Officer for Thompson Reuters – began exploring the possibility of opening a new restaurant near Bryant Park with a formal ownership and operational role for Rosey.  *Id.* at ¶ 32. Rosey was eager to combine her substantial restaurant experience with Robert's business experience to create a considerably larger, new restaurant concept and vision unlike any of the previous restaurants in which she was involved.  Because each of the previous restaurants appealed to

different demographics and clientele – for example, Valbella Meatpacking was largely a weekend

dinner destination, and Valbella Midtown was a 3,000-square-foot, almost exclusively weekday

lunch destination – Rosey and Robert wanted to open a distinct restaurant that drew both lunch and

dinner patrons seven days a week.  They settled on the highly desirable, well-traversed, and touristy

area surrounding Bryant Park and Times Square.  And in 2019, they identified a property of interest

– an 18,000 square foot space with multiple floors and rooms then occupied by a Chinese restaurant

in distress (DaDong) – but due to the eventual COVID-19 pandemic, the project was delayed.

In February 2021, Rosey formed an LLC called Oak Grove Road, LLC ("OGR").  Because

she did not consult with an attorney or accountant when drafting the relevant documents, the filings

with the New York Department of State ("DOS") and the original OGR Operating Agreement

mistakenly reflect David as the sole member, when in fact, Rosey held a majority interest in the LLC.

Rosey Dec. ¶ 33; Buzzard Dec. Ex. 26 at 27-29; 32.

In April 2021, OGR along with Mr. Daleo's Alpine Pike Investments, LLC ("Alpine Pike"),

formed Valbella At The Park, LLC ("VATP LLC"), for the purpose of opening a new restaurant

called Valbella At The Park, a name Robert coined, located at Bryant Park ("VATP").  Shifrin Dec.

Ex. 2.  OGR and Alpine Pike each own 50% of VATP LLC.  Consistent with her purpose of making

Rosey a majority stakeholder interest in OGR, Rosey made a series of contributions from the Joint

Account and the Kalayjian Personal Account from February 2021 through February 2022.  The

payment schedule, as reflected in the Amendment to the OGR Operating Agreement, was: (i)

$500,000 from the Joint Account on February 26, 2021; (ii) $600,000 from the Kalayjian Patriot

Account on April 21, 2021; (iii) $250,000 from the Joint Account on July 19, 2021; (iv) $350,000

from the Joint Account on September 7, 2021; and (v) $200,000 from the Joint Account February 7,

2022.  *See* Buzzard Dec. Ex. 21.  As such, despite the errors in the DOS filings and Operating

Agreement, these early contributions made contemporaneously with the formation of OGR reflect Rosey's and David's longstanding intent to make Rosey the majority member of OGR. Consistent with the foregoing, the 2021 K-1 for OGR lists Rosey as a 90% member. Rosey Dec. ¶ 36; Ex. 43.

In June 2022, out of an abundance of caution, David and Rosey decided to formalize Rosey's ownership interests in OGR by amending the OGR Operating Agreement and memorializing the prior assignment of a 66% interest in OGR to Rosey in consideration for the previous payments identified above, and an additional 24% interest as compensation for Rosey's contemplated Director of Operations role at VATP. Plaintiffs' assertion that David transferred his interests in OGR for ten dollars is at odds with this evidence, including the terms of the Amendment to the OGR Operating Agreement and the bank records that support the transfers listed above.

From the restaurant's inception through its formal opening, Rosey has served, and continues to serve, as Director of Operations, mirroring her roles in the various restaurants described above. Because VATP is one of Robert's many investments, he has ceded day-to-day management of the restaurant to Rosey, but he negotiated the original lease with the landlord and is principally responsible for managing VATP's finances. Rosey Dec. ¶ 38; Shifrin Dec. Ex. 2; 9:19-22; 58:1-8.

## LEGAL STANDARDS

To obtain an order of attachment, a movant must show "by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that the plaintiff will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims." CPLR § 6212(a). The burden is on the moving party to establish the grounds for the attachment. *Graubard Mollen Dannett & Horowitz v. Kostantinides*, 709 F. Supp. 428, 432 (S.D.N.Y. 1989).

Even if a plaintiff satisfies the statutory requirements of CPLR 6201 and 6212(a), the provisional remedy of an attachment remains a discretionary one. *Asdourian v. Konstantin*, 50 F. Supp. 2d 152, 159 (E.D.N.Y. 1999).  "[S]ince attachment is an extraordinary remedy created by statute in derogation of the common law, the provision should be strictly construed in favor of those against whom it is employed." *Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 332 (2d Cir. 1983); *see also Grafstein v. Schwartz*, 100 A.D.3d 699, 699 (2d Dept. 2012) (referring to attachment as a "harsh remedy"); *Bollenbach v. Haynes*, 18-cv-997, 2018 WL 4278347, at *2 (S.D.N.Y. May 29, 2018) ("[I]t is well settled that discretion to grant or deny a motion for an order to attachment rests with the court, even when the statutory requirements are met.").

Here, Plaintiffs have stated their intent to bring a turnover application under the N.Y. UVTA, part of the New York Debtor and Creditor Law ("NYDCL"), which deems transfers by a debtor voidable if they are made "with actual intent to hinder, delay or defraud any creditor of the debtor." NYDCL § 273(a).  The "actual intent" prong must be pleaded with specificity, as required by Fed. R. Civ. P. 9(b).  *Neuman v. Garcia*, 20-cv-10723 (PKC), 2022 WL 4448722, at *11 (S.D.N.Y. Sept. 23, 2023).  In determining actual intent under NYDCL § 273(a), "consideration may be given, among other factors," to a list of 11 factors listed in § 273(b).[4]

---

[4] These factors include whether: (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor.  N.Y.D.C.L § 273(b).

## ARGUMENT

**I.   PLAINTIFFS HAVE NOT DEMONSTRATED A PROBABILITY OF SUCCESS ON THE MERITS OF THEIR ANTICIPATED TURNOVER APPLICATION AND THUS ARE NOT ENTITLED TO AN ORDER OF ATTACHMENT**

Plaintiffs' attachment motion must be denied because they have failed to meet their burden under CPLR § 6212(a) to demonstrate a probability of success on their anticipated turnover proceeding.  The core inquiry under NYDCL § 273(a) is whether David made any "transfers" to Rosey, as defined by the VATP, "with actual intent to hinder, delay or defraud," which the Court "may" discern using the factors listed in § 273(b), "among others."  Here, the full evidentiary record – which Plaintiffs conveniently disregarded in their opening brief – establishes that the deposits into and subsequent withdrawals from the Joint Account were either (i) not "transfers" at all under the UVTA; or (ii) made pursuant to a longstanding life and business partnership, including for consideration of "reasonably equivalent value," and thus do not demonstrate the requisite intent, much less with the specificity Fed. R. Civ. P. 9(b) requires.  Given the full 20-year context of the parties' relationship – their longstanding use of a Joint Account in which they comingled their assets, their *de facto* joint ownership of their residential properties, Rosey's extensive contributions to David's restaurants and their shared homes, Rosey's launching of her own restaurant (VATP), and David's age and health – Plaintiffs will not succeed in proving that David made any "transfers" with the "actual intent to hinder, delay or defraud" his creditors under NYDC § 273(a).

**A.   Half the Funds Deposited Into the Joint Account ($2,030,277.75) Belonged to Rosey, and Thus Her Withdrawal of Those Funds Were Not "Transfers" Under the UVTA**

As a threshold matter, Rosey owned half the money in the Joint Account, and thus the withdrawals of *her* funds out of the Joint Account cannot be deemed "transfers" under the UVTA. As Plaintiffs recognize, the UVTA limits the definition of a "transfer" to one involving assets or property of a debtor.  *See* NYDCL § 270(p) (defining transfer, in part, as "parting with an asset") and

16

(b) ("[a]sset means property of a debtor").  Under Section 675 of New York's Banking Law

("BNK"), however, the deposit of funds into a joint bank account is "prima facie evidence . . . of the

intention of both depositors or shareholders to create a joint tenancy."  "Upon creating a joint bank

account, it is presumed the creator made an irrevocable gift of one-half of the funds therein to the

other joint owner and 'each tenant [has] a present unconditional property interest in an undivided one

half of the money deposited, ***regardless of who put the funds on deposit***.'"  *In re Leff*, 631 B.R. 106,

121 (Bankr. E.D.N.Y. 2021) (emphasis added).  A joint tenant also "has the right to alienate his own

one-half interest throughout the life of both tenants" and to consent to the other joint account holder's

withdrawal of more than his or her statutory interest.  *Id.*

Here, "[a]s a matter of law, [Rosey] had the right to put half of the funds in the Joint Account

to her own use."  *Id.* at 122.  Consequently, half of the joint funds Rosey withdrew belonged to her,

not David, and are not subject to turnover under the UVTA.  Tellingly, Plaintiffs gloss over the

significance of the Joint Account by treating the deposits into and subsequent transfers out of that

account as "the functional equivalent of a direct transfer" on the purported ground that the deposits

into the Joint Account "did not affect [David's] ownership interests vis-à-vis his creditors."  Dkt. No.

420-34 at 17.  But Plaintiffs cite no authority whatsoever in support of their "functional equivalent"

standard.  Nor would such a standard make any sense, as it would extinguish a joint account holder's

statutory right to half the joint funds, including the right to "alienate his own one-half interest

throughout the life of both tenants," as Rosey did here.

Plaintiffs' extensive reliance on *Ivy League Med. Realty Corp. v. Toran*, Case No. 10-

600991, 2010 N.Y. Misc. LEXIS 6582 (N.Y. Sup. Ct. N.Y. Co. Dec. 1, 2010) proves the point.

While the court in that case granted the attachment motion with respect to the judgment debtor's

*interest* in funds deposited into the joint account shared with his wife, Plaintiffs fail to note that the

Court deemed that interest to be **_half the amount deposited_** based on the principles articulated above. *Id.* at *11 (holding judgment debtor "had an interest in half . . . of the proceeds that were deposited into the [joint account]" and that judgment creditor was only "entitled to this amount"); *see also In re Jacobs*, 394 B.R. 646, 675 (Bankr. E.D.N.Y. 2008) (denying summary judgment as to transfers from joint account because there was no proof that the transfers "consisted solely of [the debtor's] property"). The same is true here. Rosey owned half the funds deposited into the Joint Account and could access or disburse her half however she wished.

Any argument by Plaintiffs that the Court should disregard the legal significance of the Joint Account because these transfers were "fraudulent" is at odds with the evidence. Viewed in full context, there was nothing unusual about each of the deposits into the Joint Account that Plaintiffs challenge here. David deposited into the Joint Account the proceeds from: (i) the sale of the Canterbury House, which they lived in together for years, jointly paid for from comingled assets, and Rosey substantially improved; (ii) the refinanced Southampton Property, in which they also lived together for years, which was paid for from comingled assets, and which Rosey also dramatically improved (Id. ; (iii) a sale of OIBL, a business that David owned and Rosey ran and operated absent any David's involvement; and (iv) David's income over the course of a year from Valbella Midtown, another restaurant Rosey helped manage. *See supra* 5-7; 11-12. These deposits into the Joint Account were routine, and the mere presence of a lawsuit does not turn the ordinary into the suspect.

Plaintiffs self-servingly use the 2019 scheduling of the trial in this action as a benchmark for fraudulent intent, but the trial date was repeatedly postponed due to Covid, and the evidence strongly suggests that David would have followed the same practice he had followed throughout his relationship with Rosey had he never been sued. Despite arguing that the couple is, "for all intents and purposes, a family," Plaintiffs ignore that both the Canterbury House and Southampton House

18

were clearly intended to be the joint assets of that very family.  Not every couple gets married or puts both names on the deeds of properties they, as a practical matter, jointly own.  And the lack of these legal formalities does not suggest fraud, especially when their intent to share their assets is clearly discernable from a nearly two-decade track record of doing precisely that.

Although, as described below, Rosey is entitled to keep *all* the transfers Plaintiffs seek to attach (and then have turned over), this threshold analysis applying New York joint-tenancy principles alone reduces Plaintiffs' $3,935,555.68 attachment request by $2,030,277.75 (Rosey's share of those transfers) to a remaining sum of $1,905,277.93.

**B.** **Because Rosey Provided Consideration More Than Reasonably Equivalent Value for the Remaining $1,905,277.93, the Title to the Southampton House, and Her Interest in OGR, Those Transfers Were Not Made With Intent to Hinder, Delay, or Defraud**

Separate and apart from the 50% of the deposits into the Joint Account that were legally hers, Rosey provided ample consideration for every other transfer Plaintiffs allege in their motion, including: (i) the $1,905,277.93 she transferred to her personal account exceeding her rightful 50%; (ii) the transfer of title to the Southampton House; and (iii) the transfer of ownership interests in OGR.  "Services rendered by third parties for a debtor have [] been found to constitute fair consideration."  *Exeter Holdings, Ltd. v. Haltman*, CV 13-5475 (JS) (AKT), 2020 WL 4587533, at *13 (E.D.N.Y. Apr. 21, 2020).  "Whether a transfer is for reasonably equivalent value is largely a question of fact . . . [that] depends on all the circumstances surrounding the transaction."  *In re Actrade Fin. Techs. Ltd.,* 337 B.R. 791, 803 (Bankr. S.D.N.Y. 2005).  In general, "the party challenging the conveyance" has the "burden of proving the lack of fair consideration."  *EMA Fin., LLC v. Joey New York Inc.*, 17-CV-9706 (VSB), 2022 WL 292920, at *8 (S.D.N.Y. Feb. 1, 2022).

*First*, Rosey's withdrawal of the OIBL Sale Proceeds in 2021(half of which was Rosey's) discharged David's debts to Rosey for six years of undercompensated and uncompensated labor.

Despite her small (and, for a time, non-existent salary), Rosey operated that restaurant without *any involvement* from David.  That is precisely why he deposited the proceeds from its sale into the Joint Account and authorized Rosey to transfer the full amount.  This transfer was entirely consistent with the couple's previous sale of TuttaBella in January 2016 – *prior to the 2017 lawsuit* – another restaurant that Rosey single-handedly transformed into a highly profitable and successful restaurant without assistance from David.  The $300,000 Rosey received from the sale of OIBL amounts to an additional $50,000 per year in compensation for her extensive work at OIBL.  *See supra* at 10-11.

**Second**, Rosey's transfer and withdrawal of the Canterbury Sale Proceeds and the Southampton Refinancing Proceeds, as well as the addition of her name on the deed to the Southampton House, discharged the debts David owed to Rosey for her significant, invaluable contributions to both properties and legally formalized what was a longstanding reality.  That Rosey paid the mortgage on the Southampton House via payments from the Joint Account alone provides sufficient consideration for the transfer of title – and she provided considerably more.  *See supra* 4-8.

**Third**, the transfer of $675,000 of the $800,000 Valbella Midtown Income over the course of a year – a sum that included $400,000 of *Rosey's* assets and only $275,000 of David's – compensated Rosey for her substantial contributions not only to Valbella Midtown, but also Valbella Meatpacking and Bellasera, the latter of which Rosey devoted well over a year of her time and effort toward without being compensated.  Rosey's contributions to these restaurants spanned a total of 15 years.  That amounts to $18,333/year in income for her work on those restaurants – which, quite frankly, is not even sufficient given the extensive contributions recounted above.  *See supra* 9-12.

**Fourth**, Rosey paid for her interests in OGR from funds that were legally hers and as partial compensation for her position at Director of Operations at VATP.  Rosey was always intended to be the majority stakeholder in OGR and the Director of Operations at VATP, and despite Rosey's

20

original mistake when forming OGR, every step taken by the couple reflects that reality.  As expressly stated in the Amendment to the OGR Operating Agreement, and as Plaintiffs fail to mention, David agreed to Rosey's entitlement to a 90% interest in OGR in consideration for: (i) a $600,000 payment from the Kalayjian Patriot Account; (ii) a series of payments totaling $1,300,000 made from the Joint Account, half of which statutorily belonged to Rosey; and (iii) Rosey's prominent and formal role as Director of Operations at VATP.  Buzzard Dec. Ex. 22.  Despite these payments expressly noted in their own exhibits, Plaintiffs assert the demonstrably false contention that this transfer was executed for only ten dollars. *See supra* 13-15.

In sum, Rosey legally earned at least the $1,905,277.93 exceeding her 50% entitlement to the funds in the Joint Account (which amounts to $95,263 in compensation over 20 years), the joint title to the Southampton House, and her interest in OGR.[5]  Although Plaintiffs point to the factors listed in NYDCL § 273(b), those factors, which the Court "may" use to discern a debtor's intent, are neither necessary nor exhaustive.  The critical inquiry is David's intent in making the alleged transfers to Rosey – and Rosey has provided 20 years of evidentiary facts probative of a *non*-fraudulent intent, including demonstrating consideration of reasonably equivalent value for all transfers she received, consistent with NYDCL § 273(b)(8), of funds that were not already hers to begin with.  The remaining factors, including those discussed by Plaintiffs, do nothing to tilt the scales in their favor.  Rosey has provided ample evidence negating the weight of the existing lawsuit under § 273(b)(4).

---

[5] The cases Plaintiffs rely on are all distinguishable.  *Cadle Co. v. White*, No. 02-cv-00030 (TPS), 2006 U.S. Dist. LEXIS 11671, at *19 (D. Conn. Mar. 21, 2006) (finding that the transferor did not receive reasonably equivalent value for the transfers in question); *Yong Xiong He v. China New Star Rest., Inc.*, No. 19-CV-5907 (PKC) (CLP), 2020 WL 6202423, at *15-16 (E.D.N.Y. Oct. 22, 2020) (noting that although the agreements purported to transfer the property for $10 and other consideration, the full sale price was actually $0); *In re Pisculli*, 426 B.R. 52, 67 (E.D.N.Y. 2010) (finding no consideration given testimony of both the debtor and his wife that they deposited the funds into the wife's personal bank account in order to "prevent judgment [sic] creditors from freezing the accounts and receiving the money").

Plaintiffs' claim that David has rendered himself insolvent consistent with § 273(b)(5) and (9) is belied by his continued 50% interest in the Southampton House and 10% interest in OGR.

Equally false is Plaintiffs' claim that the transfers in this case were "concealed" under § 273(b)(3), as every single transfer in this case was above board, effectuated through official channels, and was fully documented by the very people Plaintiffs claim acted with fraudulent intent. Moreover, Plaintiffs improperly rely on allegedly unanswered subpoenas as proof that these transfers were "concealed," which presumes the subpoenas were properly served – when, in fact, the one directed to Rosey was not.[6] And Rosey's purported "evasiveness" during her deposition is addressed above.[7] *See supra* page 8. Further, Plaintiffs' claim that David retains possession or control of the transferred property under § 273(b)(2) is both false and nonsensical: Plaintiffs' own motion proves the funds were transferred to Rosey, David continues to partially own both the Southampton House and OGR (and thus his continued use of both proves nothing), and Rosey's payment of certain day-to-day expenses are consistent with the couple's 20-year life partnership and, in any event, fails to demonstrate that David retains control of the nearly $4 million Plaintiffs seek. In short, Plaintiffs'

---

[6] Rosey was never properly served with the subpoena Plaintiffs reference. Under CPLR § 5222, service of an information subpoena must be made "personally in the same manner as a summons; or by registered or certified mail, return receipt requested; or if issued by the support collection unit, by regular mail, or by electronic means as set forth in CPLR 5222(g)." As stated in the Affidavit of Service, the subpoena was given to one of Rosey's colleagues at VATP, not to Rosey, and was subsequently mailed via "first class mail" – no return receipt requested. *See* Shifrin Dec. Ex. 3; Dkt. No. 456 Ex. D.

[7] The cases Plaintiffs rely on to support this point are distinguishable. *See Pantheon Props. v. Houston*, No. 10-cv-3241 (ALC)(SN), 2022 U.S. Dist. LEXIS 45061, at *9-10 (S.D.N.Y. Mar. 14, 2022) (where the debtor was "evasive" in his deposition answers, refusing to specify how much of the transfers he spent on business expenses, where there were records showing debtor had diverted company funds for personal use to spend on luxury retailers, such as Barneys, Balenciaga, and Louis Vuitton); *Prabir v. Bukhara Indian Cuisine, Inc.*, No. 17-cv-3704 (AJN) (HBP), 2018 U.S. Dist. LEXIS 94563, at *11, 15-16 (S.D.N.Y. May 17, 2018) (where debtor stated that he transferred funds to his wife and niece because he had "borrowed money" from them without being able to describe what he borrowed that money for).

reliance on these Section 273(b) factors is flawed, misleading, and otherwise fails to negate the documented life and business partnership demonstrating the non-fraudulent intent of the transfers.

### C.   David's Age and Health Issues Provide Additional Context for the Transfers

David's age – 73 and over 20 years older than Rosey – further explains the transfers in this case.  David was clear in his deposition that his age was a major factor in putting Rosey's name on the Southampton House deed, and Rosey has further confirmed that he recently was diagnosed with stage four cancer.  Plaintiffs' attachment motion depends on David's intent – and the presence of a lawsuit should not negate David's obvious desire to ensure that his life partner receives the fruits of her labor over many years and has security in the house into which she poured her life.  Indeed, these concerns would exist even without the pending lawsuit.

## II.   NO GROUNDS FOR ATTACHMENT EXIST

Plaintiffs have failed to demonstrate any ground for the drastic remedy of attachment. Plaintiffs' contemplated fraudulent conveyance claim against *Rosey* is not "based on a . . . judgment of a court of the United States."  CPLR § 6201(5).  Rosey is not a judgment-debtor, unlike the subject of the attachment order issued in the one case Plaintiffs cite.  *See U.S. Bancorp Equip. Fin.*, *Inc. v. Rubashkin*, No. 18357/10, 2011 N.Y. Misc. LEXIS 136, at *35-36 (N.Y. Sup. Ct. Jan 31, 2011). Nor can Plaintiffs make use of the heightened standards of § 6201(3), which permits attachment where "the defendant, with the intent to defraud . . . has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."  Plaintiffs conflate their burden under the UVTA with their *elevated* burden under Section 6201(3) – but they are not the same.  "[R]emoval, assignment or other disposition of property is not a sufficient ground for attachment; fraudulent intent must be proven, not simply alleged or inferred, and the facts relied upon to prove it must be fully set forth in the moving affidavits."  *Encore Credit Corp. v. Lamattina*, No. CV-05-5442 (CPS), 2006 WL 148909, at *3 (E.D.N.Y. Jan. 18, 2006).  Because "[f]raud is not

lightly inferred," plaintiffs' "moving papers must contain evidentiary facts as opposed to conclusions proving the fraud." *Id.* "It must appear that fraudulent intent really exists in the defendant's mind." *Sylmark Holdings Ltd. v. Silicone Zone Intl. Ltd.*, 5 Misc. 3d 285, 302 (Sup. Ct. N.Y. Cty. 2004).

Here, Plaintiffs have not offered *any* evidence supporting *Rosey's* fraudulent intent, much less "proving" it, or demonstrating that *Rosey* has or is about to dispose of her assets.  Plaintiffs cannot rely on the UVTA, which implicates *David's* intent, to discharge their heightened burden of proving *Rosey's* intent to attach *her* assets.  Yet that is precisely what they have done.  Plaintiffs' reliance on supposed discovery improprieties, while false, are insufficient even if true.  *Chartwell Therapeutics Licensing LLC v. Citron Pharma LLC*, No. 16-CV-3181 (MKB)(CLP), 2018 WL 1402239, at *8 (E.D.N.Y. Mar. 4, 2018) ("[M]ere delay alone does not constitute fraudulent intent."); *Man Wei Shiu v. New Peking Taste Inc.*, No. 11-CV-1175 (NGG)(RLM), 2013 WL 2351370, at *18 (E.D.N.Y. May 28, 2013) ("[D]efendants' failure to cooperate in discovery, and the various attorneys' shenanigans," were not sufficient to find fraudulent intent.).[8]

## III.   THE COURT SHOULD ORDER PLAINTIFFS TO PROVIDE A SUBSTANTIAL UNDERTAKING

Should the Court determine that an attachment is appropriate, Rosey respectfully requests that the undertaking be significantly greater than the $13,000 Plaintiffs offer.  Beyond the statutory minimum of $500, the amount to be set as an undertaking is fully within the discretion of the Court. *BSH Hausgeräte, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 672 n.2 (S.D.N.Y. 2017).  The core inquiry requires identifying the "costs and damages, including reasonable attorney's fees, which may be sustained by reason of the attachment if . . . it is finally decided that plaintiffs were not entitled to an attachment." *Hill v. Ameritax, Inc.*, 2012 N.Y. Misc. LEXIS 5061, 2012 NY Slip Op 32684(U), at

---

[8] Should the Court deny the motion for attachment, the Court should also vacate the TRO.  *See, e.g., Lamprecht v. Comte,* Case No. 93 Civ. 7928 (LMM), 1994 WL 323580, at *1 (S.D.N.Y. July 6, 1994) (denying attachment motion and vacating TRO).

*5-6 (Sup. Ct. Oct. 17, 2012).  Plaintiffs' claim that the amount of their proposed undertaking is

.33% of the ultimate attachment amount is false because it ignores the illiquid assets Plaintiffs also

seek to attach.  This makes the percentage of the proposed undertaking significantly less than the

.33% Plaintiffs note is "similar to the amounts fixed in other cases."  Plaintiff's Mot. at 24.

Moreover, should the Court enter an attachment order, Rosey's assets will be unavailable to her.

Besides the mounting legal fees associated with this action, having these assets unavailable to her

during the pendency of the turnover proceedings will cause Rosey to incur costs and damages.  For

these reasons, Rosey respectfully requests the Court set the undertaking in the amount of $400,000.

## IV.   PLAINTIFFS HAVE NOT DEMONSTRATED ANY NEED FOR DISCOVERY IN AID OF AN ATTACHMENT

Under C.P.L.R. § 6220, discovery is available only on motion after an attachment order is

entered, and only to the extent necessary to identify assets sufficient to satisfy the order.  *See Yong*

*Xiong He v. China New Star Rest., Inc.*, No. 19-CV-5907 (PKC) (CLP), 2020 WL 6202423, at *16

(E.D.N.Y. Oct. 22, 2020) (denying discovery where assets sufficient to cover judgment attached);

*Etalon Imob S.R.L. v. Schoenbach*, No. 12-CV-6868, 2012 WL 4741595, at *5 (S.D.N.Y. Oct. 3,

2012) (discovery permitted "[s]o long as the order [of attachment] is outstanding and unsatisfied").

Here, Plaintiffs seek discovery into "*other* assets that might be subject to attachment and/or eventual

execution."  The request should be denied until and unless Plaintiffs (i) obtain an attachment order

and (ii) demonstrate that any discovery in aid of that specific attachment order is necessary.

## CONCLUSION

For the foregoing reasons, Rosey respectfully requests that the Court deny Plaintiffs' motion for an order of attachment and remove all restraints on Rosey's assets, including the temporary restraining order currently in place.

Dated:  August 25, 2023
       New York, New York

**BAKER & HOSTETLER LLP**

By: */s/ Michael S. Gordon*

Michael S. Gordon
Maximillian S. Shifrin

45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4265
Facsimile: (212) 589-4280
mgordon@bakerlaw.com
mshifrin@bakerlaw.com

*Attorneys for Non-Party Rosey Kalayjian*