UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAVLE ZIKOVIC, on behalf of himself and others similarly situated,<br><br>        Plaintiff,<br><br>    -v-<br><br>LAURA CHRISTY LLC d/b/a VALBELLA, LAURA CHRISTY MIDTOWN LLC, DAVID GHATANFARD, AND GENCO LUCA,<br><br>        Defendant. | Case No.: 17-CV-00553-GHW |

**DECLARATION OF ROSEY KALAYJIAN IN OPPOSITION TO
PLAINTIFFS' MOTION FOR ATTACHMENT**

ROSEY KALAYJIAN, being duly sworn, deposes and says:

  1.  I am the Director of Operations at Valbella At The Park ("VATP") and longtime life and business partner of David Ghatanfard, one of the judgment-debtors in this action ("David"). I submit this declaration in opposition to Plaintiffs' motion to attach what amounts to every asset I own, possess, and have earned over many years managing David's restaurants and contributing enormous efforts to the two homes we have shared. The facts in this declaration are based on my own personal knowledge, acquired over nearly 20 years, and various records confirming my personal knowledge.

  2.  Plaintiffs apparently believe that everything I have belongs to David. This is not only false, but insulting. I have been a working woman my entire adult life and have *earned* everything that I have through the efforts detailed in this declaration. Plaintiffs' narrow focus on certain transfers made during an 18-month period completely disregards our decades-long joint ownership of homes, bank accounts, and everything else spouses typically share – all while simultaneously

working as close business partners across all of David's restaurants.  As discussed below, the knowledge of restaurant management that I developed over the last 20 years enabled me recently to launch a new restaurant, VATP, with someone other than David (though David holds a very small 5% indirect interest in VATP).  And the asset transfers that Plaintiffs discuss in their motion cannot be properly understood without considering the entire context of my life together with David.

3. Although David and I never married, signed contracts, or kept strict accounts of our comingled finances – which is why I genuinely could not recall the circumstances surrounding the bank transactions that Plaintiffs' counsel questioned me about during my deposition – that does not mean I should be stripped of assets that I rightfully earned.  In retrospect, I wish we had formalized our relationship and various partnerships in writing, but our failure to do so does not make these partnerships, and my contributions to them, any less real.  Based on the facts below, I respectfully request that the Court honor my longstanding partnership with David, however informal, deny Plaintiffs' motion for an attachment, and remove all existing restraints on my rightfully owned assets.

A. **My Personal Life With David**

4. David and I are longtime life and business partners who have lived and worked together for approximately 20 years.  I first met David in 2004 when I took a job as a hostess at David's flagship restaurant in Greenwich, Connecticut, Valbella Greenwich.  At the time, I worked at a hedge fund in Rye, New York, and took the position for additional income.  Over time, I developed a personal relationship with David and, a few years later, became pregnant.  To support what we hoped would be our growing family, we decided to buy a home together.

    *1.*    *The Canterbury House and Joint Account*

5. At the time, I was working part-time as a real estate agent, and thus I acted as our agent and actively searched for a house.  We eventually bought a house on Canterbury Road in

Harrison, New York (the "Canterbury House").  Attached as **Exhibit 1** is a true and correct copy of the record of sale on the Canterbury House listing myself as the selling agent.

6.  We lived together at the Canterbury House for approximately 14 years.  Although I was not formally added to the deed, I contributed my commission from the sale to the purchase of the house, and David and I had an understanding that the Canterbury House was a joint house into which we both invested.  During my life there, I conducted myself as any co-owner would, and David treated me as co-owner.  I also managed various improvements—including to the driveway, landscaping, fence, and pool.

7.  Consistent with our treatment of the Canterbury House as a joint asset, David and I opened a joint account at Patriot Bank in 2011 to pool our assets and provide a shared security (the "Joint Account").  Attached as **Exhibit 2** is a true and correct copy of the Account Agreement for the Joint Account, dated June 28, 2011.

8.  Over the course of the next decade, both David and I made deposits into the Joint Account and used it to pay numerous joint expenses, including, among others, the mortgage on the Canterbury House.  Attached as **Exhibit 3** is a January 2016 statement for the Joint Account, a year *before* Plaintiffs brought their lawsuit, reflecting deposits, payments for our mortgages and other bills, and a check written and signed by me.  The Canterbury House mortgage payment is reflected in the monthly line item for $9,000 to "BAC HOME LOAN."

9.  I lost the pregnancy that prompted our purchase of the Canterbury House, and I would lose six more during our time at the Canterbury House.  With no children to fill the house, and constantly haunted by and reminded of the lost pregnancies, we repeatedly placed the Canterbury House on the market during our time there.  Attached as **Exhibit 4** is a true and correct copy of a

listing history for the Canterbury House, showing that we listed the house for sale in 2011, 2012, 2014, 2016, twice in 2017, and finally in 2020.

10. It was not until the COVID-19 pandemic dramatically increased demand for suburban homes that we were able to sell the Canterbury House. Consistent with the lives we had built together, our longstanding informal agreement to treat the house as a joint asset (just like our Joint Account), and our payment of the Canterbury House mortgage from the Joint Account, David deposited the proceeds from the $1,237,762.50 sale into the Joint Account. After the sale of the Canterbury House, we rented an apartment in Yonkers, New York, but the Southampton property, discussed below, became our primary residence.

   2. *The Southampton House*

11. David and I also shared another property on Oak Grove Road in Southampton, New York ("Southampton House"), which David purchased the year before I met him. Just as we did with the Canterbury House, David and I treated the Southampton House as a joint asset despite David being the sole owner on paper, including paying the monthly mortgage from our Joint Account. The $10,000 monthly payment for "Capital One Lo – Moneyline" in the January 2016 Joint Account statement (*see* Exhibit 3) reflects our mortgage payment on the Southampton House.

12. David rarely used the Southampton House before I met him, and the property was largely unkept and in disrepair. After we met, I told him that we need to take advantage of the property and improve it, and that is exactly what I did. For well over a decade, I made extensive enhancements and upgrades to the home, including renovating the kitchen, bathrooms, backyard, deck, and landscaping. Attached as **Exhibits 5 through 9** are true and correct copies of photographs reflecting my renovation of the Southampton House patio in 2012.

13. I managed and oversaw each one of the Southampton House renovations, working closely with the contractors, and picked out all the design elements down to the tile. Had this work been outsourced, the designer's fee/commission alone would have been at least $150,000. Attached as Exhibit 10 is a true and correct copy of an email, dated April 11, 2011, between me and our architect reflecting my management of renovations.

14. When the house experienced extreme water damage in 2018 due to our pipes freezing and then exploding, I oversaw the reconstruction of the house as well as negotiations with the insurance company to process all reimbursements. The reconstruction project took six months and required me to live in and out of hotels throughout that entire period. Absent my daily involvement, the Southampton House *never* would have been restored to the condition it was in prior to the water damage, and any project manager that David would have hired to oversee the remediation process would have received substantial six-figure compensation for their services. I received no compensation for my efforts. Attached as **Exhibits 11 through 15** are true and correct copies of photographs of the reconstruction project showing the full extent of the work throughout the house.

15. The mortgage on the Southampton House had an adjustable interest rate that fluctuated over time. Because it was clear toward the end of 2021 that interest rates would likely increase substantially, we decided to refinance the mortgage on the Southampton House in January 2022. Attached as **Exhibit 16** are true and correct copies of sample mortgage statements from 2020 through 2022 reflecting an adjustable interest rate in 2020 and 2021 followed by a fixed rate in 2022 after we refinanced the mortgage.

16. To this day, given all the work I put into the Southampton House, I routinely refer to it as "my baby." Consistent with these contributions, our joint mortgage payments, our many years living together with comingled assets, and our treatment of the proceeds from the Canterbury House

as joint funds, David deposited the proceeds from the refinanced mortgage ("Southampton Refinance Proceeds") on the Southampton House into the Joint Account and transferred his sole title on the Southampton House to a joint-tenancy with a right of survivorship in 2022. In addition to being fully consistent with how we lived our lives, including our shared monthly contribution to the mortgage, David decided to put me on the deed (i) because he is 73 years-old—over 20 years older than me—and wanted to make sure that I had adequate security; and (ii) in recognition of my extensive contributions to the Southampton House over many years, including the mortgage payments, utility expenses, and my extensive involvement in the two gut renovation and reconstruction projects discussed above.

17. Unfortunately, David's concerns about his age were well-founded. In July 2023, David was diagnosed with stage four cancer. His prognosis is uncertain, and he will be undergoing treatments indefinitely.

3. *My Withdrawal of the Canterbury Sale and Southampton Refinancing Proceeds*

18. As explained above, David's deposits of the Canterbury Sale Proceeds and the Southampton Refinancing Proceeds into the Joint Account was consistent with how we shared our lives and comingled our assets. After those deposits, and as reimbursement for my efforts improving both houses over many years, I withdrew from the Joint Account: (i) the Canterbury Sale Proceeds via transfers to my personal savings account at Patriot Bank (the "Kalayjian Patriot Account") between September 11 and September 16, 2020; and (ii) the Southampton Refinancing Proceeds on January 12, 2022 via cashier's check. As I explain more fully below, this is consistent with how David and I have always shared our lives – including comingling our assets by making large deposits into and large withdrawals out of the Joint Account.

B.  **My Business Partnership with David**

19.  As our relationship blossomed, I quickly developed into one of David's core business partners and served in a critical management and supervisory role across David's entire portfolio of restaurants for minimal, and often non-existent, compensation. Attached as **Exhibits 17 through 23** are true and correct copies of portions of my 2015-21 tax returns reflecting my compensation.

*1.  My Management Role at Valbella Meatpacking*

20.  When David opened his first New York restaurant, Valbella Meatpacking, in 2005, he invited me to shift my hours from Valbella Greenwich to Valbella Meatpacking. Forsaking my career at a hedge fund to pour myself into my budding business and personal relationship with David, the scope of my involvement in David's restaurants significantly expanded once I moved to Valbella Meatpacking. Although my formal title was often an entry-level position like "hostess," I was, in reality, a core member of the restaurant's management team. In that role, I spearheaded marketing efforts, website design, greeted regular clientele, networked and socialized on behalf of the business, booked and organized private parties, oversaw regular maintenance and upgrades (*e.g.*, picking new furniture and light fixtures), bought supplies, worked closely with the pastry chef, and many other managerial tasks that far exceeded the duties of a hostess. Because David did not use email (and to this day does not), I was, in essence, a proxy for David in various capacities and effectively managed and oversaw his interactions with everyone in the business. Attached as **Exhibit 24** is a true and correct copy of an email, dated February 6, 2009, reflecting my management and improvement of the Valbella Meatpacking website design.

*2.  My Extensive Efforts Transforming and Overseeing TuttaBella, and My Entitlement to the Full Proceeds of its Subsequent Sale in Consideration for my Efforts*

21.  Not only did I operate as, essentially, the manager of David's restaurants, I often made core marketing and branding decisions that played a pivotal role in making them more

successful. For example, early in our relationship, David owned a restaurant in Eastchester, New York called Valbella Steakhouse. The restaurant was losing money, and in 2008, David asked me to figure out what could be done to change the restaurant's prospects. I proceeded to personally reinvent the restaurant, changing its name (from Valbella Steakhouse to TuttaBella), logo, branding, and menu. The restaurant experienced an immediate turnaround and made substantial profits for several years thereafter, with David playing a silent role in its growth trajectory. Attached as **Exhibit 25** is a true and correct copy of an email, dated March 27, 2013, reflecting my statement at the time of having to work "7 days straight @ TuttaBella open to close."

22.     When David sold his share in TuttaBella for approximately $788,000 in January 2016, David deposited the proceeds ("TuttaBella Sale Proceeds") from the sale into the Joint Account, which I subsequently transferred in full to my Kalayjian Patriot Account for my extensive contributions to the success of TuttaBella. I specifically recall David telling me "You earned this money." This transfer took place over a year before Plaintiffs filed the lawsuit in this case and is consistent with our longtime practice of sharing our assets and acknowledging each other's contributions to the businesses we developed. The January 2016 Joint Account bank statement, attached as Exhibit 3 above, reflects David's deposit and my subsequent transfer of the TuttaBella Sale Proceeds.

   *3.     My Role as Chief Operating Officer of OIBL For Minimal Compensation*

23.     Our treatment of TuttaBella was a pattern of practice. In February 2015, David became an owner of a pre-existing restaurant called One If By Land ("OIBL") and asked me to focus on improving that restaurant's profile and sales. In the first full year of my involvement—without taking any salary at all—I was essentially the director of operations, managing everything from accounting, insurance, building permits, and legal compliance. In 2016, I eventually put myself on

the payroll for only $600/week, a salary that was not commensurate with my contribution to the restaurant, with the understanding that I would eventually be repaid.

24. During my more than six years overseeing OIBL, I: (i) managed the website design and other marketing projects; (ii) ordered various supplies the restaurant needed; (iii) oversaw payroll and corresponded with ADP; (iv) managed maintenance projects, including, among other management-level tasks, organizing security camera installation, new doors, and scheduling garbage pickup; (v) worked on the renewal of the restaurant's retail and liquor license with the state of New York; (vi) was in frequent communication with OIBL's landlords; (vii) oversaw insurance-related issues; (viii) scheduled walkthroughs with building and zoning consultants to prepare for Department of Buildings inspections; and (ix) managed many administrative tasks, including routinely communicating with various employees on the full suite of subjects relevant to restaurant management.  Attached as **Exhibits 26 through 34** are true and correct copies of various emails and documents supporting these roles.

25. I was also responsible for the company's Paycheck Protection Program applications, which resulted in OIBL receiving funds that allowed it to financially withstand the impact of the Covid-19 pandemic on the business.  Attached as **Exhibit 35** is a true and correct copy of OIBL Restaurant LLC's approval for the Paycheck Protection Program loan, dated April 12, 2020.

26. In 2021, just as we did with TuttaBella, David sold his stake in OIBL for $600,000 (the "OIBL Sale Proceeds") and deposited the proceeds into the Joint Account.  I subsequently withdrew the full amount – beyond my half – as compensation for six years of running OIBL. During those six years, just as with TuttaBella, David was a silent owner who did not perform any significant work for the restaurant.  With the transfer of the OIBL Sale Proceeds, I made an

additional $50,000 per year in income, on top of the small salary I took, serving effectively as the Chief Operating Officer of OIBL. Again, this was income that I earned.

    4.  *My Role Opening and Managing Bellasera Without Receiving Compensation*

    27.  In 2019, I again took the laboring oar opening a new restaurant on behalf of David called Bellasera, this time in Larchmont, NY.  I did everything at Bellasera: I named the restaurant, designed the logo, and spearheaded the entire project of opening the restaurant's doors.  Attached as **Exhibit 36** is a true and correct copy of an email, dated October 15, 2019, reflecting my coordination of various tasks in anticipation of the restaurant formally opening.

    28.  After it opened, and the Covid-19 pandemic began, I ran the business from home with the General Manager, went to the restaurant every week, and managed the restaurant's books and records.  By the time David decided to eliminate his stake in the restaurant in 2020, I had devoted approximately a year to that restaurant without getting paid a dime.  Attached as **Exhibit 37** are true and correct copies of various sales orders addressed to "Bellasera Ristoronte c/o Rosey Kalayjian," reflecting my day-to-day management of the restaurant.

    5.  *My Efforts to Open and Manage Valbella Midtown*
       *and the Income Deposited into the Joint Account*

    29.  In 2011, when David sought to open a second restaurant in New York City, I personally shopped around on foot to identify a new location and played a key role in opening what would become Valbella Midtown.  In addition to identifying the location, I was a critical member of the design team, picking out the core details of the restaurant's future design.  Although I ultimately did not spend significant time operating the restaurant, I nevertheless was pivotal in the marketing, renovation, employee management, and other tasks commensurate with a manager – all while simultaneously overseeing TuttaBella, Valbella Meatpacking, OIBL, and Bellasera.

30. In addition to the proceeds of the sales of TuttaBella and OIBL, and consistent with our life and business partnership over many years, David also deposited the income he received from his other restaurants into the Joint Account. These deposits were typical prior to the lawsuit, as the January 2016 Joint Account statement attached as Exhibit 3 demonstrates.

31. From September 2020 through September 2021, David made five deposits into the Joint Account of his distributions from Valbella Midtown totaling $800,000. Over the course of that year, I subsequently transferred $675,000 of that $800,000 to my Kalayjian Patriot Account. As with previous transfers from our Joint Account, including those related to the 2016 sale of TuttaBella, the $275,000 beyond my half was compensation for my efforts to open Bellasera and other undercompensated contributions to Valbella Meatpacking and Valbella Midtown over many years. This was income that I earned. Again, our personal and business lives have long been intertwined, and these transfers were fully consistent with how David and I have done business since long before the underlying lawsuit was brought, as discussed above.

  6. *My Role Creating Oak Grove Road LLC and Opening Valbella At The Park With New Partner Robert Daleo/Alpine Pike Investments, LLC*

32. Given my extensive experience managing TuttaBella, OIBL, Bellasera, and other restaurants, in 2018, my longtime friend and mentor, Robert Daleo – a retired, former Vice Chairman and Chief Financial Officer of Thompson Reuters – and I began exploring the possibility of opening a new restaurant near Bryant Park with a formal ownership and operational role for me. I was eager to combine my substantial restaurant experience with Robert's business experience to create a considerably larger, new restaurant concept and vision unlike any of the previous restaurants in which I was involved. Because each of the previous restaurants appealed to different demographics and clientele – for example, Valbella Meatpacking was largely a weekend dinner destination, and Valbella Midtown was a 3000-square-foot, almost exclusively weekday lunch destination – Robert

and I wanted to open a distinct restaurant that drew both lunch and dinner patrons seven days a week. We settled on the highly desirable, well-traversed, and touristy area surrounding Bryant Park and Times Square.  And in 2019, we identified a property of interest – an 18,000 square foot space with multiple floors and rooms then occupied by a Chinese restaurant in distress (DaDong) – but due to the eventual COVID-19 pandemic, the project was delayed.

33. In 2021, we began to move the project forward.  In February 2021, I formed an LLC called Oak Grove Road, LLC ("OGR").  I handled all the Department of State ("DOS") filings myself and, unfortunately, did not consult with an attorney or accountant in advance.  As a result, the New York Department of State ("DOS") filings and the original OGR Operating Agreement mistakenly reflect David as the sole member, when in fact, I held a majority interest in the LLC. Buzzard Dec. Ex. 26 at 27-29; 32

34. In April 2021, OGR along with another company fully owned by Robert, Alpine Pike Investments, LLC ("Alpine Pike"), formed Valbella At The Park, LLC ("VATP LLC"), for the purpose of opening a new restaurant called Valbella At The Park, a name Robert coined, located at Bryant Park ("VATP").   OGR and Alpine Pike each own 50% of VATP LLC.

35. Consistent with our longstanding aim of making me the majority stakeholder of OGR, I made a series of contributions from the Joint Account and my Kalayjian Patriot Account from February 2021 through February 2022.  The payment schedule, as reflected in the Amendment to the OGR Operating Agreement, was as follows:

1. $500,000 from the Joint Account on February 26, 2021
2. $600,000 from my Kalayjian Patriot Account on April 21, 2021
3. $250,000 from the Joint Account on July 19, 2021
4. $350,000 from the Joint Account on September 7, 2021

      5. $200,000 from the Joint Account February 7, 2022

Attached as **Exhibits 38 through 42** are true and correct copies of bank statements reflecting the above transfers from both the Joint Account and my Kalayjian Patriot Account, including an OGR bank statement clearly showing a wire of $600,000 from my Kalayjian Patriot Account.

      36.     Despite the initially incorrect DOS filings and the Operating Agreement, these early contributions made at the same time we formed OGR reflect our longstanding intent to make me a majority member of OGR. That is precisely why the 2021 K-1 for OGR lists me as a 90% member. Attached as **Exhibit 43** is a true and correct copy of OGR's 2021 K-1.

      37.     In June 2022, out of an abundance of caution, we decided to formalize my ownership interests in OGR by amending the OGR Operating Agreement and memorializing the prior assignment of a 66% interest in OGR to me in consideration for the previous payments identified above, and an additional 24% as compensation for my contemplated Director of Operations role at VATP. Plaintiffs' apparent assertion that David transferred these interests to me for $10 is both false and ridiculous.

      38.     From the restaurant's inception through its formal opening, I have served, and continue to serve as Director of Operations, mirroring my roles in the other restaurants described above. Because VATP is one of Robert's many investments, he has ceded day-to-day management of the restaurant to me, but he negotiated the original lease with the landlord and is principally responsible for managing VATP's finances.

      39.     For all these reasons and those contained in the memorandum of law submitted by my attorneys, I respectfully ask the Court to deny Plaintiffs' motion for an attachment of assets that are mine, that are the result of my hard work and that I am not "holding" for David's benefit.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing statements made by me are true and correct.

Dated:  New York, New York
        August 25, 2023

/s/ Rosey Kalayjian
Rosey Kalayjian