UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAVLE ZIVKOVIC, on behalf of himself and others similarly situated,<br><br>          Plaintiff,<br><br>     v.<br><br>LAURA CHRISTY LLC d/b/a VALBELLA, LAURA CHRISTY MIDTOWN LLC, DAVID GHATANFARD, and GENCO LUCA,<br><br>          Defendants. | 17-CV-00553 (GHW) |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR AN ORDER OF ATTACHMENT AGAINST THE ASSETS AND PROPERTY TRANSFERRED FROM JUDGMENT DEBTOR DAVID GHATANFARD TO NON-PARTY ROSEY KALAYJIAN**

**JOSEPH & KIRSCHENBAUM LLP**

D. Maimon Kirschenbaum
Josef Nussbaum
Lucas C. Buzzard
32 Broadway, Suite 601
New York, NY 10004
Tel: (212) 688-5640

*Attorneys for Plaintiffs and the*
*Fed. R. Civ. P. 23 Subclasses*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

I.     ARGUMENT ............................................................................................................ 11

    A.  Under the UVTA, Ghatanfard's Deposits into the Joint Account Were
        "Transferred" to Kalayjian When She Withdrew the Funds .................................. 1

    B.  There Was no Valid Consideration for Any of the Assets Transferred Via the Joint
        Account or the Transfer in Title of the Southampton House ..................................... 5

    C.  Plaintiffs are Entitled to Attachment and Execution of Ghatanfard's Original 100%
        Ownership Interest in OGR ....................................................................................... 11

    D.  Valid Grounds for Attachment Exist under NYDCL § 276(a)(2) and C.P.L.R. §
        6201(3) and (5) ......................................................................................................... 14

    E.  The Undertaking Ordered by The Court in Connection with the TRO is Sufficient
        and Plaintiffs are Entitled to Discovery in Aid of Attachment .................................. 15

II.    CONCLUSION ........................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Buttry v. Gen. Signal Corp.*, 68 F.3d 1488 (2d Cir. 1995)................................................10

*Hawkins v. Zoegall*, No. 23-cv-4040,
    2023 U.S. Dist. LEXIS 106583 (E.D.N.Y. June 20, 2023) ..................................15

*In re Leff*, 631 B.R. 106 (E.D.N.Y. Bankr. 2021).............................................................1

*Ivy League Medical Realty Corp. v. Toran*, No. 10-600991,
    2010 N.Y. Misc. LEXIS 6582 (N.Y. Sup. Ct. Dec. 1, 2010)...............................5

*Leaf Funding, Inc. v. HSBC Bank USA, N.A.*, No. 22761/09,
    906 N.Y.S.2d 773 (N.Y. Sup. Ct. Oct. 6, 2009) ...................................................3

*Matter of Canandaigua Nat'l Bank & Trust Co. v. Brighton Sec. Corp.*,
    214 A.D.3d 1443 (4th Dep't 2023).........................................................................2

*Matter of JRP Old Riverhead, Ltd.*, 106 A.D.3d 914 (2d Dep't 2013)............................2

*Matter of N.Y. Comm'y Bank v. Bank of Am., N.A.*,
    169 A.D.3d 35 (1st Dep't 2019) .............................................................................2

*Matter of Signature Bank v. HSBC Bank USA, N.A.*, 67 A.D.3d 917 (2d Dep't 2009)....2

*Mirlis v. Greer*, 2023 U.S. App. LEXIS 22938, __ F.4th __ (2d Cir. Aug. 30, 2023).....3,4

*Nassau Cnty v. N.Y. State Urban Dev. Corp.*, 4 N.Y.S.3d 874 (N.Y. Sup. Ct. 2015)......10

*N.Y. State Comm'r of Taxation & Fin. v. Wachovia Bank, N.A.*, No. 401181/05,
    2010 N.Y. Misc. LEXIS 3757 (N.Y. Sup. Ct. Aug. 3, 2010) ...............................3

*Nwoye v. Obama*, No. 22-cv-1791,
    2023 U.S. Dist. LEXIS 125697 (S.D.N.Y. July 20, 2023) ..................................10

*SEC v. Smith*, 646 Fed. App'x 42 (2d Cir. Apr. 18, 2016) ..............................................2

*Umscheid v. Simnacher*, 106 A.D.2d 380 (2d Dep't 1984)............................................10

*U.S. Bancorp Equip. Fin., Inc. v. Rubashkin*,
    2011 N.Y. Misc. LEXIS 136 (N.Y. Sup. Ct. Jan. 30, 2011)................................14

*Van Brunt v. Raushenberg*, 799 F. Supp. 1467 (S.D.N.Y. 1992) ...................................10

*Viggiano v. Viggiano*, 136 A.D.2d 630 (2d Dep't 1998).................................................2

**Statutes, Rules, and Regulations**

C.P.L.R. § 6201(3)...............................................................................................14,15

C.P.L.R. § 6201(5)...............................................................................................14

Conn. Gen. Stat. § 52-552g(1)(B)........................................................................4

Conn. Gen. Stat. § 52-552b(12)...........................................................................4

N.Y. Debt. & Cred. Law § 270(p) ........................................................................1,4

N.Y. Debt. & Cred. Law § 273(a)(1).....................................................................5,6

N.Y. Debt. & Cred. Law § 273(b) .........................................................................5,11

N.Y. Debt. & Cred. Law § 275(a)(2).....................................................................3,4

N.Y. Debt. & Cred. Law § 276(a)(2).....................................................................14

N.Y. Debt. & Cred. Law § 281 .............................................................................4

Plaintiffs respectfully submit this Reply in further support of their motion for attachment. (ECF No. 420). For the reasons stated in Plaintiffs' opening brief (ECF No. 420-34) and this Reply, the Court should grant Plaintiffs' attachment motion in its entirety.

## I.  ARGUMENT

### A.  Under the UVTA, Ghatanfard's Deposits into the Joint Account Were "Transferred" to Kalayjian When She Withdrew the Funds.

Plaintiffs seek attachment of, *inter alia*, $3,935,555.68, which is the sum of the monies Ghatanfard transferred to Kalayjian via the Joint Account stemming from the following sources: (1) the sale of the Canterbury House ($1,237,763.50); (2) distributions from Valbella Midtown ($675,000); (3) the sale of One if By Land ($600,000); and (4) the proceeds of Southampton House refinance ($1,422,793.18).

Kalayjian argues that by depositing those funds into the Joint Account, Ghatanfard irrevocably gifted half of each deposit to her and therefore her withdrawal of the gifted half is not a "transfer" voidable under the UVTA. *See* Opp'n at 16-19. This argument has no basis in New York law. To begin, Kalayjian cites no authority for her underlying assumption that a "gift" is not a voidable UVTA "transfer." The UVTA defines "transfer" as "*every mode . . . of disposing of or parting with an asset or an interest in an asset.*" NYDCL § 270(p) (emphasis added). This expansive definition necessarily sweeps gifts – undoubtedly "modes" of "disposing of or parting with" assets – into the realm of voidable "transfers." Any other result would be nonsensical. If a debtor could evade the UVTA simply by "gifting" assets to relatives and family members, it would defeat its entire purpose. Indeed, even the case Kalayjian relies on to assert that deposits into joint accounts are gifts also recognized the deposits were "transfers." *In re Leff*, 631 B.R. 106, 122 (E.D.N.Y. Bankr. 2021) (debtor's "deposit of these funds into the Joint Account resulted in a transfer of half the funds to [the wife]," who was the "initial transferee"). Thus, even if Kalayjian were correct

that Ghatanfard "gifted" her half the funds upon deposit, that would still be a UVTA "transfer."

In any event, as Plaintiffs previously explained, a joint account "creates a rebuttable presumption that each named tenant is possessed of the whole of the account so as to make the account vulnerable to the levy of a money judgment by the judgment creditor of one of the joint tenants." *Viggiano v. Viggiano*, 136 A.D.2d 630, 630 (2d Dep't 1998). New York appellate authority clearly holds that where an account holder fails to rebut this presumption by showing the account was "intended . . . to be a convenience account for [the] benefit [of the non-debtor account holder] and that the [debtor] had no interest in the account," *id.*, the *entirety* of the account is subject to levy and execution by creditors of the debtor account holder. *See Matter of Canandaigua Nat'l Bank & Trust Co. v. Brighton Sec. Corp.*, 214 A.D.3d 1443, 1443-44 (4th Dep't 2023) (where husband and wife "admitted" they were joint tenants of a brokerage account, "*all* funds held in the . . . account are subject to the levy of a money judgment" against the husband (emphasis added)); *Matter of N.Y. Comm'y Bank v. Bank of Am., N.A.*, 169 A.D.3d. 35, 38-39 (1st Dep't 2019) (where wife failed to rebut the presumption as to a safety deposit box, the "*whole* of the account [was] subject to [a creditor's] levy" and the entire contents ordered turned over to "satisfy a judgment against [the husband]" (emphasis added)); *Matter of JRP Old Riverhead, Ltd.*, 106 A.D.3d 914, 914-915 (2d Dep't 2013) (upholding turnover to a husband's creditor of all funds held in a joint account where presumption not rebutted); *Matter of Signature Bank v. HSBC Bank USA, N.A.*, 67 A.D.3d 917, 918-919 (2d Dep't 2009) (only where the "presumption is rebutted" that "the judgment creditor's levy on the jointly owned bank account is effective only up to the actual interest of the judgment debtor in the account" and affirming the turnover of all funds in two joint bank accounts where presumption not rebutted); *see also SEC v. Smith*, 646 Fed. App'x 42, 43 (2d Cir. Apr. 18, 2016) (rejecting wife's argument that only half of a joint account was subject to

turnover to satisfy a judgment against husband where she failed to rebut the presumption).

Pursuant to this authority, Plaintiffs could have levied and executed against the entirety of Ghatanfard's deposited assets so long as they remained in the Joint Account. As a result, the plain language of the UVTA dictates that the voidable "transfers" were not "made" for purposes of that statute until Kalayjian *withdrew* the funds, thus placing them out of the reach of Ghatanfard's creditors.[1] *See* NYDCL § 275(a)(2) (a transfer is "made" under the UVTA when it is "so far perfected that a creditor on a simple contract cannot acquire a judicial lien otherwise than under [the UVTA] that is superior to the interest of the transferee").

This is precisely the conclusion the Second Circuit reached when faced with an identical scenario under Connecticut's Uniform Fraudulent Transfer Act ("CUFTA"), which mirrors the UVTA. *See Mirlis v. Greer*, 2023 U.S. App. LEXIS 22938, __ F.4th __ (2d Cir. Aug. 30, 2023) (considering whether a judgment creditor could recover funds a wife "withdrew from bank accounts she held jointly with her debtor husband and placed into her personal, individually held bank accounts"). There, like here, a wife argued that funds she withdrew from joint accounts were not "transfers" under CUFTA because her husband gifted her the funds by depositing them into

---

[1] To be clear, Plaintiffs are not currently seeking to execute on the *contents* of the Joint Account, which is when the presumption of half ownership of the account cited by Kalayjian could come into play. There are several New York trial court decisions holding that because of the presumption that each account holder is entitled to ownership of half the account, a creditor is not *automatically* entitled to execute on the full contents of a joint account. *See, e.g., N.Y. State Comm'r of Taxation & Fin. v. Wachovia Bank, N.A.*, No. 401181/05, 2010 N.Y. Misc. LEXIS 3757, at *2-4 (N.Y. Sup. Ct. Aug. 3, 2010); *Leaf Funding, Inc. v. HSBC Bank USA, N.A.*, No. 22761/09, 906 N.Y.S.2d 773 (N.Y. Sup. Ct. Oct. 6, 2009). Those cases (a) are not relevant because Plaintiffs seek avoidance of transfers *through* a Joint Account, not to execute on the account itself, (b) do not appear to be consistent with the wealth of New York appellate authority cited in the text, which clearly allows execution of the *entire* account, and (c) would not in any event prevent Plaintiffs from executing on the funds deposited by Ghatanfard because even in those cases, a creditor may reach more than half the account by showing there was a "disproportionate ownership" of the joint account. *See Leaf Funding, Inc.*, 906 N.Y.S. at 773 (directing turnover of 87% of a joint account based on evidence that the debtor made 87% of the deposits into the account).

the accounts. *See id.* at \*14. The Circuit disagreed, holding that the wife's *withdrawals* were CUFTA "transfers" and she was liable to her husband's creditors for entirety of the withdrawn amounts. First, the Circuit noted that CUFTA (like the UVTA) contains an expansive definition of the term "transfer" that encompasses "*every* mode, *direct or indirect* . . . of disposing with or parting with an asset or an interest in an asset." *Id.* at \*15 (quoting Conn. Gen. Stat. § 52-552b(12)); *accord* NYDCL § 270(p) (same). Second, the Circuit held that because under Connecticut law (like under the New York law set forth above) the husband's funds in the accounts were subject to creditors' liens while they remained there, the transfers were not "complete" under CUFTA until the wife withdrew the funds. *Mirlis*, 2023 U.S. App. LEXIS 22938 at \*17-18 ("[E]ven if [the] husband's deposits constituted gifts to [the wife], as she argues, her withdrawals of those funds perfected the transfers *by him* and thus constituted 'transfers by a debtor' for purposes of CUFTA."); *compare* Conn. Gen. Stat. § 52-552g(1)(B) (CUFTA "transfer" is "made" when it "is so far perfected that a creditor on simple contract cannot acquire a judicial lien otherwise than under [CUFTA] that is superior to the interest of the transferee"), *with* NYDCL § 275(a)(2) (same).

*Mirlis*'s reasoning mirrors and validates Plaintiffs' argument that the relevant UVTA "transfer" occurred here when Kalayjian withdrew the funds, thus placing them out of reach of Ghatanfard's creditors.[2] *See* Pls. Mem. at 17-18. Moreover, the Circuit's interpretation of CUFTA should be accorded great weight because the UVTA has identically worded provisions and instructs courts to construe and apply its text "to effectuate its general purpose to make uniform the law with respect to the subject of this article among states enacting it." NYDCL § 281. Finally, the only New York case Plaintiffs could locate addressing an analogous transfer of funds via a joint account also held that a creditor could reach the entirety of the judgment debtor's original

---

[2] Plaintiffs did not cite *Mirlis* in their opening brief because it was decided after the filing.

interest in assets that were deposited into a joint account and then subsequently "transferred" by being withdrawn by the other account holder. *Ivy League Med. Realty Corp. v. Toran*, 2010 N.Y. Misc. LEXIS 6582, at *11-21 (N.Y. Sup. Ct. Dec. 1, 2010).[3]

In sum, where (a) Ghantanfard owned 100% of all relevant assets before they were deposited into the Joint Account and (b) the entirety of those funds were subject to Plaintiffs' levy while they remained in the account, the relevant UVTA "transfer" was completed when Kalayjian's withdrawals put those funds out of reach. Aa a result, the entirety of the $3,935,555.68 transferred to Kalayjian via her withdrawals is voidable under the UVTA.

### B. There Was no Valid Consideration for Any of the Assets Transferred Via the Joint Account or the Transfer in Title of the Southampton House.

Kalayjian next argues she provided "ample" consideration for $1.9 million transferred to her via the Joint Account (i.e., the other half of Ghatanfard's $3,935,55.68 deposits) and the transfer in title to the Southampton House.[4] Kalayjian Mem. at 19-23. To begin, it appears Kalayjian is under the incorrect assumption that the presence of valid consideration negates a finding of "actual intent to hinder, delay, or defraud" under NYDCL § 273(a)(1). It does not. Consideration is only one of eleven statutory factors consider when determining "if the debtor

---

[3] Kalayjian's argument that *Ivy League* supports her position that Plaintiffs are entitled to only half of Ghatanfard's funds deposited into the Joint Account is misguided. *See* Opp'n at 17-18. While *Ivy League* held a creditor was entitled to reach only half of the proceeds of the refinance of a married couple's co-op apartment, that conclusion was *not* because the proceeds were deposited into a joint account. Instead, it was because the couple owned the co-op as tenants by the entirety and therefore the husband was always entitled only "to half of the proceeds of the . . . refinance" *even before the deposits were made. Id.* at *11-12. It is precisely that original interest – "half of the proceeds of the refinance" – the court found was fraudulently conveyed to the wife when she withdrew it from the couple's joint account. *Id.* at *21.

[4] Because (a) the transfer of the full $3,935,555.68 deposited into the Joint Account is voidable under the UVTA for the reasons discussed above (not half as Kalayjian argues), and (b) Kalayjian asserts she provided consideration only for $1.9 million of that sum, *id.*, she has conceded that there was no valid consideration for the remaining $2,030,277.75.

made the transfer . . . with actual intent." *Id.* § 273(a)(1) & (b). Thus, as Plaintiffs have shown the existence of at least six other factors indicative of Ghatanfard's actual intent, *see* Pls.' Mem. at 18-22, they are likely to prevail on their UVTA claims even if valid consideration were present.

But it is clear there was no valid consideration here for two reasons. First, Kalayjian's allegations that there was consideration for these transfers are palpably incredible because they are based on falsehoods and conclusory statements in her self-serving declaration that contradict her deposition testimony. The most egregious of these is her blatant misrepresentations about a purported January 2016 transfer of the proceeds of Ghatanfard's sale of TuttaBella restaurant, which Kalayjian repeatedly holds up as evidence that the couple's practice of transferring assets from Ghatanfard to Kalayjian via the Joint Account predates the commencement of this lawsuit and thus cannot be considered fraudulent. *See* Opp'n at 2-3, 9-10, 20. Specifically, Kalayjian states that after Ghatanfard sold TutaBella in January 2016, he "deposited the proceeds . . . into the Joint Account, which [she] subsequently transferred in full to [her] Kalayjian Patriot Account for [her] extensive contributions to the success of TuttaBella. . . . *This transfer took place over a year before Plaintiffs filed the lawsuit in this case* . . .." Kalayjian Decl. ¶ 22 (emphasis added).

These statements are demonstrably false. Kalayjian could not have transferred *any* money from the Joint Account to the Kalayjian Account in January 2016 because the Kalayjian Account *was not opened until* April 11, 2019 (two years after the commencement of this case). *See* Buzzard Decl., Ex. 4 (Joint Account Signature Card). The Kalayjian Account, where all other transfers at issue were placed after being withdrawn from the Joint Account, ends in account number ***5258. *Id.*, Exs. 4, 5. Kalayjian submits no statement from *that* account showing the January 2016 transfer, and the Joint Account statement she has submitted reflects the TuttaBella proceeds were transferred to account number ****0612. Kalayjian Decl. ¶ 22 & Ex. 3. Whatever account that is,

it is not the Kalayjian Account; nor has Kalayjian submitted evidence that ****0612 is her personal account rather than another joint account, an account belonging solely to Ghatanfard, or an account owned by a third party. In short, to validate her receipt of millions of dollars of Ghatanfard's money after the commencement of this lawsuit by arguing it was a continuation of a practice that preceded this litigation, Kalayjian has falsely represented under oath that she transferred funds into the Kalayjian Account at a time when that account did not even exist. This is not only indicative of the specious nature of her entire declaration, but also demonstrates her actual intent to hinder, delay, and defraud Plaintiffs in the collection of their judgment.

Kalayjian's disingenuousness does not end there. Her declaration is full of statements that directly contradict her own prior sworn testimony about the transfers at issue. Namely:

- Kalayjian's statement that Ghatanfard deposited the Canterbury House sale proceeds into the Joint Account which she later withdrew "as reimbursement of [her] efforts" improving the house, Kalayjian Decl. ¶¶ 10, 18, is contradicted by her deposition testimony that she did not know how much Ghatanfard sold that house for or "what he did with the proceeds of the sale." Buzzard Decl., Ex. 1 at 56:22-57:3.

- Kalayjian's tale of how she and Ghatanfard decided together to refinance the mortgage on the Southampton House to take advantage of a fixed interest rate, Kalayjian Decl. ¶ 15, is contradicted by her deposition testimony that the "first time" she heard about the refinance was when she received "different" mortgage papers in the mail, and she did not "discuss any refinance" with Ghatanfard, Buzzard Reply Decl., Ex. A at 97:16-98:17.

- Kalayjian's assertions she was "reimburse[ed]" $1.2 million from the Canterbury House sale in September 2020 and $1.4 million from the Southampton refinance in January 2022, and she "earned" the hundreds of thousands of dollars of "income" she received from Ghatanfard after

the OIBL sale in 2021 and the Midtown disbursements in 2020 and 2021, Kalayjian Decl. ¶¶ 18, 26, 31, are contradicted by her deposition testimony that her only sources of income in the last ten years were the various restaurants at which she worked, and she did not "believe" she ever earned more than $200,000 in a year, Buzzard Reply Decl., Ex. A at 91:11-92:15. Furthermore, despite testifying to receiving millions of dollars in "reimbursements" and "earnings" from 2020 to 2022, Kalayjian did not report any of that income on her tax returns for that period. *See* Kalayjian Decl., Exs. 22 (2020 Return), 23 (2021 Return).

- Kalayjian's statement that her withdrawals from the Joint Account of the OIBL sale proceeds and the Midtown disbursements were compensation for her past services at Ghatanfard's restaurants, *id.* ¶¶ 26, 31, is directly contradicted by her deposition testimony that any time Ghatanfard's money went from the Joint Account to the Kalayjian Account it was "reimbursement" for "household bills." Buzzard Decl., Ex. 1 at 151:12-24.

Further undercutting any inference of consideration here is that Ghatanfard, whose "intent in making the alleged transfers" Kalayjian concedes is "critical," Opp'n at 21, has never acknowledged the *existence* of the monetary transfers she maintains he made, much less any consideration for them. Ghatanfard has not submitted a declaration in support of Kalayjian's opposition, and the only transfer since 2017 he listed in response to Plaintiffs' information subpoena was the title transfer in the Southampton House. Buzzard Decl., Ex. 27 at Question 16. When pressed at deposition what he had done with the approximate $3.5 million he received since September 2020 from the sale of the Canterbury House, the disbursements from Midtown, and the refinance of the Southampton Property, at no point did Ghatanfard explain he transferred any of that amount to Kalayjian as compensation for her past services at his restaurants. Nor did he testify that 100% of the Canterbury sale and Southampton refinance went to Kalayjian as

"reimbursements." Instead, he variously testified that he did not know where those monies went, that some went to "expenses" and "taxes," and that other amounts were given to his family in Iran. Buzzard Decl., Ex. 10 at 123:17-124:9, 144:3-20, 145:22-146:8, 148:5-10, 237:14-17, 240:15-241:21. Indeed, it was not until *Plaintiff's counsel* brought up Kalayjian that Ghatanfard first testified it was "possible" that "some money" went to her for the money she was "investing, paying the mortgage and everything else." *Id.* at 241:24-242:8. Simply put, there is no possible way to even infer from Ghatnafard's information subpoena responses or deposition testimony that he transferred to Kalayjian (a) any monies from the sale of OIBL or the Midtown distributions or (b) the entirety of the millions in proceeds of the Canterbury House sale and Southampton refinance in "consideration" for her past services or contributions.

The second reason there is no valid consideration here is that under New York law, past consideration is not consideration. At bottom, Kalayjian argues that (a) the transfers of the OIBL sale proceeds and the disbursements from Midtown were in consideration for her past services to Ghatanfard's restaurants and (b) the transfers of the Canterbury House sale proceeds, the Southampton House refinance proceeds, and the title to the Southampton House were in consideration for her past contributions to those properties. *See* Opp'n at 19-21. Notably, Kalayjian introduces no evidence she performed these services or contributions *in exchange* for Ghatanfard's pre-performance promise to pay her the proceeds of the various sales/disbursements or to transfer title in the Southampton House. *See* Kalayjian Decl. Instead, she asserts only that *she* withdrew the sums from the Joint Account *after the fact* "as reimbursement for her efforts" or as "compensation" for her already performed work. *Id.* ¶¶ 18, 26, 31.

In New York, such "past consideration is not consideration. A promise supported by past consideration is unenforceable because the detriment did not induce the promise." *Nwoye v.*

9

*Obama*, No. 22-cv-1791, 2023 U.S. Dist. LEXIS 125697, at \*22 (S.D.N.Y. July 20, 2023) (citing numerous cases); *accord Nassau Cnty v. N.Y. State Urban Dev. Corp.*, 4 N.Y.S.3d 874, 883-84 (N.Y. Sup. Ct. 2015) ("[S]omething that had been given before a promise was made, and therefore without reference to it, is not by itself legal consideration for the promise."). An exception to this rule is a "written" promise signed by the promisor that has "the consideration expressed in writing." N.Y. Gen. Oblig. Law § 5-1105; *see Umscheid v. Simnacher*, 106 A.D.2d 380, 381 (2d Dep't 1984). This writing requirement extends to situations where, as here, past services are alleged to be valid consideration. *See Nassau Cnty*, 4 N.Y.S.3d at 883 ("[T]o constitute valid legal past consideration, the writing must refer to the consideration, albeit for past services, and couple that recitation with the promise to pay."); *Van Brunt v. Raushenberg*, 799 F. Supp. 1467, 1471 (S.D.N.Y. 1992) ("past services may constitute valid consideration" only "where there is a written agreement signed by the promisor"). Here, where no writing detailing the past consideration has been introduced, and there is no evidence of a pre-performance promise, there is no consideration.[5]

Given Kalyjian's false declaration statements, the direct contradictions between her declaration and deposition testimony, and the absence of any evidence from Ghatanfard supporting consideration, it is clear Kalayjian's declaration is not credible and should be disregarded. *Cf., e.g.*, *Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995). At the very least, the falsehoods and contradictions, coupled with (a) the lack of valid consideration as a matter of law and (b) the

---

[5] The lack of evidence of Ghatanfard's pre-performance promise differentiates this case from that cited by Kalayjian. Opp'n at 19 (citing *Exeter Holdings, Ltd. v. Haltman*, 2020 U.S. Dist. LEXIS 71925, at \*43 (E.D.N.Y. Apr. 21, 2020)). That case primarily involved the payment of *salaries* to employees, an obligation that necessarily results from a pre-performance employment agreement. *See id.* Further, the proposition for which Kalayjian cites *Exeter Holdings* – that "[s]ervices rendered by third parties for a debtor have also been found to constitute fair consideration" – has its origin in *Balaber-Strauss v. Sixty-Five Brokers*, which found that brokers' services constituted consideration for their commissions because they previously had been "hired" to produce, thus creating the debtor's contractual obligation to pay. 256 B.R. 664, 679-80 (S.D.N.Y. Bankr. 2000).

presence of the other § 273(b) "actual intent" factors set forth in Plaintiffs' opening brief, demonstrate Plaintiffs' likelihood of success on their UVTA claims thus justifying attachment.

### C. Plaintiffs are Entitled to Attachment and Execution of Ghatanfard's Original 100% Ownership Interest in OGR.

Kalayjian's position as to the ownership of and transfer of interests in OGR is utterly nonsensical. Essentially, Kalayjian wants to have her cake and eat it too, contending *both* that (1) she was always the 90% owner or OGR since the day it was created, Buzzard Decl., Ex. 26 at 27:9-16; and (2) two subsequent transfers of Ghatanfard's ownership interest in that entity in February 2021 (66%) and June 2022 (24%) OGR are non-fraudulent because they are supported by consideration, Opp'n at 20-21; Kalayjian Decl. ¶ 37. Kalayjian's position is absurd for the simple fact that if she was always 90% owner of OGR *there would be no need for either of the subsequent transfers* of Ghatanfard's ownership interest. Indeed, at deposition, Kalayjian testified that she could not recall Ghatanfard ever agreeing to transfer 66% of OGR and did not know why that language appeared in the June 2022 amendment to the OGR operating agreement.[6] Buzzard Decl., Ex. 26 at 32:16-33:16. Moreover, to the extent she attributes the OGR initial operating agreement identification of Ghatanfard as the sole member to some "mistake" on her part, Kalayjian Decl. ¶ 33, that too is absurd because (a) the only mistake she mentions has to do with OGR's online filings with the New York Department of State (which do not require *any* identification of ownership interest, *see* Pls. Br. at 15 n.7 & 8); (b) Kalayjian denied drafting the OGR operating agreement, Buzzard Decl., Ex. 26 at 29:6-13; and (c) neither the June 2022 OGR assignment agreement nor the amendment to the operating agreement make reference to any allegation that

---

[6] This purported 66% transfer in February 2021, which was obviously verbal because no writing from that has been produced, was not valid under the plain terms of the OGR operating agreement. *See* Buzzard Decl., Ex. 21 at Def295 (stating that any assignment of membership interest requires the "prior *written* consent of all Members).

the original OGR operating agreement had mistakenly identified Ghatanfard as the sole member of the LLC, *see* Buzzard Decl., Exs. 22, 23.

Further, despite repeatedly asserting she was "always intended" to be the majority shareholder of OGR and the director of operations of VATP, Kalayjian has not introduced a single contemporaneous communication or document clearly reflecting that intent in early 2021. In fact, the contemporaneous evidence points the other way. Kalayjian did not sign the April 2021 VATP operating agreement or the April 2021 resolution of VATP to enter into a lease agreement, and the VATP agreement clearly designates *Ghatanfard* as the individual with "power to direct the operations of the Restaurant." Buzzard Decl., Ex. 24 at Def17, Def27, Def29. It was not until *June 17, 2022*, the day after the OGR amendment transferring 90% of Ghatanfard's ownership to Kalayjian was executed that her name began appearing on VATP resolutions and amendments as a "member" of OGR. *Id.* at Def31-32. Furthermore, it was Ghatanfard, not Kalayjian, who signed VATP's April 2021 lease agreement on behalf of OGR. Buzzard Reply Decl., Ex. B.

Next, although Kalayjian testified at deposition she discovered her purported mistake "very, very fast after" she first opened OGR (which was in February 2021) and contacted her accountant who told her "how to do an amendment," *see* Buzzard Reply Decl., Ex. A at 205:16-21, her certificate of change was not filed with the New York Department of State until June 21, 2022 (days after the OGR amendment), *see* Buzzard Decl., Ex. 29. Furthermore, documents and communications provided to Plaintiffs from OGR's accountant, Weiner LLC, indicate that: (1) Ghatanafard obtained an Employer Identification Number from the IRS in March 2021, the notice of which listed him as the "SOLE MBR" of OGR; and (2) Kalayjian asked her accountant on *June 24, 2022* (days after the assignment) whether they needed "to write a letter to the IRS to say we are a partnership not a single member," Buzzard Reply Decl. Ex. C. Indeed, the only document

12

Kalayjian produced to substantiate any of her ownership interest in OGR prior to June 2022 is a 2021 Schedule K-1 from OGR, which lists her as a 90% owner. Kalayjian Decl., Ex. 43. But that document does not indicate when it was prepared, *id.*, and according to documents produced by OGR's accountant, OGR did not file its 2021 partnership tax return until August 2022 (months after the assignment). Buzzard Reply Decl., Ex. D (E-file Authorization).

Finally, none of this fantastical story is verified by Ghatanfard, the only other member of OGR. Instead, he conveniently disclaimed all knowledge of anything having to do with OGR, testifying he (a) could not recall signing or agreeing to the OGR operating agreement; (b) did not "know anything" about who owns OGR or any amendments to the OGR operating agreement; (c) did not know whether he ever owned OGR or was ever a member of that LLC; and (d) could not recall if he had ever heard of OGR before his deposition. Ghatanfard Dep. at 93:22-95:18; 99:10-100:9, 240:5-14. He further: (1) disclaimed it was his signature on the June 2022 amendment to the OGR operating agreement that transferred 90% of his ownership interest to Kalayjian, *id.* at 96:13-24; and (2) testified that he did not know whether it was his signature on the OGR assignment agreement, *id.* at 97:21-98:19.

Given (a) Kalayjian's incredible testimony that she was "always" the 90% owner of OGR, (b) Ghatanfard's testimony he knows nothing about OGR's ownership or the OGR amendment and assignment agreements, (c) the failure of the OGR amendment and assignment agreements to mention any mistaken attribution of 100% ownership in OGR to Ghatanfard, (d) Kalayjian's failure to produce any credible contemporaneous documents or communications prepared in 2021 reflecting the intent to make her the majority owner of OGR that year, (e) the contemporaneous communications indicating that OGR was a "single member" entity prior to June 2022, and (f) the fact that Kalayjian's signature only began appearing on official OGR and VATP documents after

13

June 16, 2022, the most likely inference is that Ghatanfard, not Kalayjian, was exclusive owner of

OGR until he lost the trial in this case, and his assignment to Kalayjian of his interest in OGR was

done to frustrate the collection of the judgment against him for all the reasons Plaintiffs previously

set forth. *See* Pls.' Br. at 18-22.

> ### D.    Valid Grounds for Attachment Exist under NYDCL § 276(a)(2) and C.P.L.R. § 6201(3) and (5).

As a final sally, Kalayjian argues that Plaintiffs have not demonstrated valid grounds for

attachment under C.P.L.R. § 6201(3) because they "have not offered any evidence supporting

*Rosey's* fraudulent intent" and they cannot use "*David's* intent" in transferring the assets to meet

their attachment burden. Opp'n at 23-24. As an initial matter, Plaintiffs are independently entitled

to attachment under C.P.L.R. § 6201(5), which does not require *any* showing of intent but instead

only that the cause of action is "based on a judgment . . . of a court of the United States," which

any turnover proceeding involving Ghatnafard's assets clearly is. And Kalayjian's attempt to

distinguish *U.S. Bancorp Equip. Fin., Inc. v. Rubashkin* because she "is not the judgment-debtor

unlike the subject of the attachment order" in that case, falls completely flat. Opp'n at 23 (citing

2011 N.Y. Misc. LEXIS 136 (N.Y. Sup. Ct. Jan. 30, 2011)). The attachment order and TRO in that

case were issued against "respondents," which included, similarly to here, the judgment debtor's

wife to whom the debtor had transferred various assets and interests in real estate. *Id.* at *2-3, 36.

Plaintiffs are *also* entitled to attachment under NYDCL § 276(a)(2) (which authorizes

attachment under the UVTA against "the asset transferred or other property of the transferee") and

C.P.L.R. § 6201(3). Contrary to Kalayjian's argument that the transferee's intent is relevant (for

which she cites no authority), the intent requirement of § 6201(3) focuses exclusively on "*the*

*defendant['s]* . . . intent to defraud *his* creditors or frustrate the enforcement of a judgment," not

on the intent of any *transferee*. C.P.L.R. § 6201(3) (emphasis added). Indeed, Judge Matsumoto

14

recently considered and rejected argument identical to Kalayjian's here: "that the requirements of § 6201(3) must be satisfied as to asset *transferees*" before attachment is permissible under NYDCL § 276(a)(2). *Hawkins v. Zoegall*, 2023 U.S. Dist. LEXIS 106583, at *11 (E.D.N.Y. June 20, 2023). Judge Matsumoto rightly found that such an interpretation would be "legally untenable" as it would permit "a defendant [to] transfer assets to numerous individuals and entities to frustrate enforcement of a judgment, or to defraud creditors, without recourse against the transferred assets or other assets of the transferees, if the transferees were not engaged in fraudulent behavior." *Id.* "This interpretation," Judge Matsumoto concluded, "is illogical considering the statutory language of § 6201, which specifically targets the actions of defendants, not transferees." *Id.* at *13 (citing C.P.L.R. § 6201(3)). Thus, while Plaintiffs have undoubtedly established intent to defraud on the part of *both* Ghatanfard and Kalayjian for the reasons set forth here and in their opening brief, only Ghatanfard's fraudulent intent is a prerequisite for attachment under § 6201(3).

### E. The Undertaking Ordered by The Court in Connection with the TRO is Sufficient and Plaintiffs are Entitled to Discovery in Aid of Attachment.

For the reasons set forth in Plaintiffs' brief, an undertaking of $13,000 (.33% of the liquid assets) is reasonable here given the strength of Plaintiffs' UVTA claims. It is also reasonable to exclude Kalayjian's ownership interest in the Southampton House and OGR from the calculation because unlike with liquid assets, attachment of real property and ownership interest in an LLC will not preclude Kalayjian's use and enjoyment of those assets but will simply prevent her from disposing of them. Finally, full discovery of Kalayjian's assets is essential for Plaintiffs to learn the *location* of assets that would be subject to attachment and execution.

## II. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their attachment motion in full.

Dated:  New York, New York
        September 15, 2023

Respectfully submitted,

By: /s/ *Lucas C. Buzzard*
D. Maimon Kirschenbaum
Josef Nussbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, NY  10004
(212) 688-5640

*Attorneys for Plaintiffs*